STATE v. ROBY E. CATRETT

No. 52

(Filed 6 January 1970)

**1. Criminal Law §§ 75, 76— in-custody statements — substantive evidence — impeachment of defendant — Miranda warnings — voluntariness — necessity for voir dire hearing**

In-custody statements attributed to a defendant, when offered by the State and objected to by the defendant, are inadmissible either as substantive evidence or for impeachment purposes unless, after a *voir dire* hearing in the absence of the jury, the court, based upon sufficient evidence, makes factual findings that such statements were voluntarily and understandingly made by the defendant after he had been fully advised as to his constitutional rights.

**2. Criminal Law §§ 75, 76— incriminating in-custody statements — impeachment of defendant — Miranda warnings — voluntariness — necessity for voir dire hearing**

In this prosecution of defendant for aiding and abetting a co-defendant in the felonious breaking and entering of a cottage and in the larceny of property therefrom, wherein defendant testified that he had no knowledge of the location of the cottage and had not seen his co-defendant on the day of the crimes after the co-defendant entered his mother's home some five hours before the crimes were committed, the trial court erred in admitting for impeachment purposes, over defendant's general objection, rebuttal testimony by a deputy sheriff of defendant's in-custody statements that he had let the co-defendant out of a car near the cottage and was supposed to pick him up in 30 or 40 minutes, where the court did not conduct a *voir dire* hearing in the absence of the jury to determine whether

the statements attributed to defendant were made voluntarily and under-
standingly after defendant had been fully advised of his constitutional
rights.

**3. Burglary and Unlawful Breakings § 5;   Larceny § 7—   sufficiency
of evidence**

State's evidence *is held* sufficient to be submitted to the jury on issues
of defendant's guilt of aiding and abetting in the felonious breaking and
entering of a cottage and in the larceny of property therefrom.

APPEAL by defendant from the Court of Appeals under G.S.
7A-30(1).

Defendant was tried at the January 1969 Session of Polk Su-
perior Court before McLean, J., and a jury, on a two-count bill
of indictment which charged that defendant *aided and abetted* Ray
Pace (1) in feloniously breaking and entering a certain house oc-
cupied by Eddie Lee Brown, and (2) in the larceny of personal
property of Eddie Lee Brown from said house. Defendant was
found guilty as charged. Judgment, which imposed an active prison
sentence on the first count and a suspended prison sentence on the
second count, was affirmed by the Court of Appeals. 5 N.C. App.
722, 169 S.E. 2d 248. Defendant appealed to the Supreme Court on
the ground a substantial question arising under the Fifth Amend-
ment to the Constitution of the United States and under Article I,
Section 11, of the Constitution of North Carolina, is presented.

On account of defendant's indigency, Judge McLean entered an
order appointing defendant's present counsel, who, as court-ap-
pointed counsel, had represented defendant at the trial, to repre-
sent him on appeal, and ordered Polk County to pay all necessary
costs incident to appeal.

The record, which includes a transcript of the evidence and of
the charge, discloses that Ray Pace was separately indicted for (1)
feloniously breaking and entering a certain house occupied by Eddie
Lee Brown, and (2) the larceny of certain personal property of
Eddie Lee Brown from said house; that the indictments against
Pace and Catrett were consolidated for trial; and that both defend-
ants were represented at trial by the same counsel. Pace is not a
party to this appeal.

*Attorney General Morgan, Deputy Attorney General Lewis and
Trial Attorney Harris for the State.*

*O. B. Crowell, Jr., for defendant appellant.*

BOBBITT, C.J.

**[2]**    The constitutional question presented relates to the admission in evidence, over defendant's general objection, of the testimony of Boyce Carswell, a deputy sheriff of Polk County, North Carolina, as to in-custody statements made to him by defendant.

During the presentation of the State's evidence, Carswell testified to the circumstances under which he arrested defendant but did not refer to any statements made by defendant on the occasion of the arrest or thereafter. After defendant had testified, Carswell was recalled. He then testified as to statements he attributed to defendant. These statements, made after he had arrested defendant and while defendant was in his custody, were in sharp conflict with defendant's testimony.

When objections were interposed to Carswell's rebuttal testimony, the presiding judge did not conduct a *voir dire* hearing in the absence of the jury to determine whether statements attributed to defendant were made voluntarily and understandingly and after defendant had been advised of his constitutional rights.

The Court of Appeals reached these conclusions: (1) That Carswell's rebuttal testimony was admissible as bearing upon defendant's credibility as a witness; (2) that defendant's general objection was insufficient to require the court to instruct the jury as to the limited purpose for which this rebuttal testimony was admitted; and (3) that, *in view of the limited purpose for which the rebuttal testimony was admitted,* the court was not required to conduct a *voir dire* hearing in the absence of the jury to determine whether the statements attributed to defendant were made voluntarily and understandingly and after defendant had been fully advised of his constitutional rights.

The admissibility of Carswell's rebuttal testimony must be considered in the context of the evidential facts narrated below.

- The State offered evidence tending to show the following:

Eddie Lee Brown, of Landrum, S. C., owned a four-room summer cottage in Polk County, N. C., which was located on a public (Old Melrose) road about seven-tenths of a mile from Saluda, N. C. Upon arrival at his mountain cottage on Saturday, August 31, 1968, between 6:00 and 6:30 p.m., Brown observed: (1) Personal property (valued at $175.00) owned by him and consisting principally of articles of furniture, which had been removed from his cottage, was piled in the yard a few feet from the cottage; (2) a man, carrying two frying pans, Brown's property, coming out of one of the win-

dows; and (3) a red and white 1959 Chevrolet, the sole occupant being a man in the driver's seat, in the portion of his driveway adjoining the road. The man who emerged from Brown's cottage left the premises on foot and was last seen walking along the road towards Saluda. He was not apprehended on or near the Brown premises. When Brown and others with him were devoting their attention to the invader of the Brown cottage, the man in the 1959 Chevrolet drove away along the Old Melrose Road, first traveling towards Saluda, turning around upon reaching another driveway and then passing the Brown premises as he headed down the mountain.

Brown drove to Saluda and reported the breaking, entering and larceny to the police.

George Smith, a Saluda policeman, was the first officer to arrive in the vicinity of the Brown cottage. He saw the red and white 1959 Chevrolet. It was parked on the side of the Old Melrose Road 300-400 feet below (down the mountain) from the Brown cottage. Catrett was under the steering wheel. As Smith stood by the Chevrolet, Deputy Sheriff Boyce Carswell, accompanied by other officers, passed on their way up the mountain to the Brown cottage. After talking with Brown, Carswell and other officers came back to where Smith was standing and the Chevrolet was parked. Carswell testified: "(W)e got him (Catrett) out of the car and placed him under arrest and put him in my car" and went to the police station in Saluda. Thereafter, another deputy sheriff and Smith arrested Pace at his mother's home. After the arrest of Pace, both Pace and Catrett were taken in a police car to the Brown cottage. Brown then identified Pace as the man who came out of the window and Catrett as the man under the wheel of the 1959 Chevrolet while it stood in his driveway.

With reference to Catrett's condition when arrested, Carswell testified: "He was drunk . . . (H)e was about as drunk a man as you see out and still going. . . . He could walk but not too steady. . . . We assisted him up the steps at the Jail. I don't think we did getting in the car. . . . His speech was impaired."

It is noteworthy that Brown's testimony included the following: As he approached his cottage, traveling up the mountain towards Saluda, Brown's attention was attracted by a red and white 1959 Chevrolet which was parked in "a space where the dirt had been cleaned back settin with the back toward the bank where it could go either way . . . to the right or to the left." The Chevrolet was parked approximately three-fourths of a mile from the Brown

cottage. When Brown was almost to it, the driver (Catrett) of the Chevrolet "just pulled out in the road in front of us and went about 15 feet and stopped." He was headed towards the Brown cottage, "toward Saluda." Catrett stopped on a narrow bridge, right in the center of it, requiring Brown to stop. As to what happened when Catrett was stopped on the bridge, Brown testified: "He opens the door, the driver's door and did something like this, I couldn't tell whether he vomited or what, but he did something and I'd say in a minute, closed the door back and then drove off very slowly." Brown waited from two to five minutes before going on because the road was so narrow "you couldn't pass anybody" between there and Brown's cottage. When Brown reached his cottage, the Chevrolet was in his driveway beside the Old Melrose Road and Catrett was under the wheel.

Catrett testified, in substance, as follows: He and Pace (brothers-in-law) were then living in East Flat Rock, Henderson County. Pace's mother lived in Saluda. On Saturday morning, August 31, 1968, in Hendersonville, N. C., they purchased a pint of vodka at the ABC store and bought a carton of beer from "a package store." They went to Polk County, traveling in Pace's red and white 1959 Chevrolet, to make inquiry concerning the rental of a house but were unable to locate the party referred to in the advertisement. Since the car was "skipping," they drove into Saluda. There, at "Saluda Texaco," they got an oil change, a new oil filter and an adjustment of the "plugs." When this work was completed, they drove to the home of Pace's mother. Pace went into his mother's home. He (Catrett) would not go in because he had been drinking. Instead, he drove Pace's car back to town (Saluda), parked the car and fell asleep. When he woke up, he thought some air would do him good. He testified: "I didn't feel like I was intoxicated, I just felt woozy, which I knew I had been drinking enough to be intoxicated, so I drove down there and drove up this small road (Old Melrose Road) and parked." When asked whether he went to sleep down there, Catrett testified: "I dozed, in a drunken stupor. I guess I was." He testified he did not know where the Brown cottage was. He testified: "I could have been to his cottage or near it or on the road to it and me not even know it." He denied having any connection with any breaking and entering or larceny at the Brown cottage. He testified he did not see Pace from the time he left the home of Pace's mother until after both had been arrested.

With reference to Carswell's testimony in rebuttal, directly involved in the question presented by this appeal, the record shows the following:

"Q. Mr. Carswell, did you have a conversation with Mr. Catrett here about his presence on the Old Melrose Road on the 31st day of August, 1968?

"A. Yes, sir.

"Q. What did he tell you, if anything, about who had been with him on the afternoon of the 31st day of August, 1968, on the Old Melrose Road?"

"MR. CROWELL: Objection.

"THE COURT: Sustained as to Pace. Do not consider this evidence as to Pace, Members of the Jury, but only as to Catrett.

"A. Well, he stated to me that he let Ray Pace out of the car above Mr. Brown's cabin and he was suppose(d) to pick him up in 30 or 40 minutes and he also said he didn't know what —

"MR. CROWELL: Objection.

"A. — Samuel Ray Pace was planning to do."

Carswell testified further that Catrett was under arrest and in custody when the statements attributed to him were made; that before questioning Catrett he advised him of his constitutional rights by reading from a card each of the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 16 L. ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R. 3d 974; and that these warnings were read to Catrett at the Atkins Service Station when he was on his way to get a warrant for Catrett. This portion of the cross-examination of Carswell is noted: "Q. That was after you had already talked to him down here on the road? A. Yes, sir. Q. That was after you had already asked him about what he was doing and who was with him? A. I don't think we asked him who was with him at that time. Q. Was this after you had already asked him about what he was doing down there? A. I don't remember."

If Carswell's testimony as to defendant's in-custody statements had been offered during the presentation of the State's case, the admission thereof, over defendant's objection, would have been erroneous unless the presiding judge, after a *voir dire* hearing in the absence of the jury, had made factual findings on sufficient evidence that defendant's statements were made voluntarily and understandingly *and* after he had been fully warned of his constitutional rights as required by *Miranda. State v. Moore,* 275 N.C. 141, 153, 166 S.E. 2d 53, 62, and cases cited; *State v. Barber,* 268 N.C. 509, 151 S.E. 2d 51, and cases cited. In this connection, see *Jackson v. Denno,* 378 U.S. 368, 391, 12 L. ed. 2d 908, 924, 84A S. Ct. 1774,

1788, 1 A.L.R. 3d 1205, 1221; *Boles v. Stevenson,* 379 U.S. 43, 13 L. ed. 2d 109, 85 S. Ct. 174.

If a *voir dire* hearing had been conducted in the absence of the jury, and if the presiding judge on sufficient evidence had made factual findings that the in-custody statements attributed to defendant were voluntarily and understandingly made after defendant had been fully advised of his constitutional rights, the challenged testimony of Carswell would have been competent as substantive evidence of significant probative value. The challenged evidence tended to show that defendant let Pace "out of the car above Mr. Brown's cabin" and that he was "suppose(d) to pick him up in 30 or 40 minutes." This evidence was in sharp conflict with defendant's testimony that he had no knowledge of the location of Brown's cottage and that he had not seen Pace since about 1:30 p.m. when Pace entered his mother's home. Its primary impact, when considered in connection with other facts in evidence, was to show that Catrett aided and abetted Pace in the commission of the crimes charged in the bill of indictment by transporting him to the scene of the crimes and giving assurance that he would return in 30 or 40 minutes to pick up Pace and such stolen goods as Pace had obtained. In short, the significant probative value of the challenged testimony was its direct bearing on defendant's guilt of the crimes charged in the bill of indictment.

The Court of Appeals held Carswell's testimony was admissible for the limited purpose of impeaching defendant's testimony, basing its decision on *Walder v. United States,* 347 U.S. 62, 98 L. ed. 503, 74 S. Ct. 354 (1954), and on *Tate v. United States,* 283 F. 2d 377 (1960).

In *Agnello v. United States,* 269 U.S. 20, 70 L. ed. 145, 46 S. Ct. 4 (1925), Mr. Justice Butler, speaking for a unanimous Court, stated: "It is well settled that, when properly invoked, the 5th Amendment protects every person from incrimination by the use of evidence obtained through search or seizure made in violation of his rights under the 4th Amendment." Accord: *Weeks v. United States,* 232 U.S. 383, 58 L. ed. 652, 34 S. Ct. 341 (1914); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 64 L. ed. 319, 40 S. Ct. 182 (1920). The opinion in *Agnello* quotes with approval the following statement from the opinion of Mr. Justice Holmes in *Silverthorne:* "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all."

In *Walder,* the defendant was tried on a 1952 indictment charg-

ing him with illegal possession of narcotics. In addition to his denial of guilt in connection with the particular transaction for which he was on trial, the defendant under direct examination (and later under cross-examination) testified he had never sold or handled narcotics and had never possessed any narcotics except what had been given him by a physician for an ailment. The Government, in rebuttal, was permitted to offer evidence that defendant had been indicted in 1950 on account of narcotics then found in his possession. Notwithstanding the 1950 indictment was dismissed on the ground the narcotics then found in the defendant's possession were obtained as a result of an illegal search and seizure, it was held that evidence with reference to this prior unrelated transaction was admissible for the purpose of impeaching the defendant's testimony that he had not previously possessed any narcotics. For present purposes, it is sufficient to point out that the testimony of Walder there involved and the contradictory testimony offered by the Government in rebuttal did not relate to the particular offense for which the defendant was then on trial. In *Walder,* Mr. Justice Frankfurter, for the Court, said: "Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny *all the elements of the case against him* without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief." (Our italics.)

Thereafter, decisions of certain appellate courts, ostensibly based on *Walder,* held that, if a defendant elected to take the stand and testify, evidence of unconstitutionally seized articles or of unconstitutionally obtained statements was admissible to impeach the defendant's testimony as to circumstances relating to the crime for which he was on trial provided it did not relate directly to *an essential element* of such crime. *Tate v. United States, supra; United States v. Curry,* 358 F. 2d 904 (2d Cir. 1966).

In *Tate,* the defendant was convicted under a two-count indictment charging that he entered a hospital with intent to steal and with the theft of hospital property. The question was whether it was error to receive, in rebuttal, testimony as to statements made by the defendant to police during a period of alleged "unnecessary delay" between arrest and preliminary hearing. For purposes of decision, it was assumed that the (impeaching) statements were made by the defendant during a period of unlawful detention. There was evidence that the defendant was seen in the hospital with an unidentified man when the building was closed to the public. When arrested, he was leaving the hospital grounds carrying a typewriter

wrapped in a coat. An unidentified man, who preceded the defendant, was not apprehended. One Payne was arrested nearby within about ten minutes. The defendant took the stand at trial. In addition to denying all elements of the crime for which he was being tried, he testified on his direct examination that he had come to the hospital alone to see a friend and that he had not known Payne before the time he and Payne were arrested. He explained his possession of the hospital's typewriter by saying that moments before he was arrested someone unknown to him had thrust the typewriter into his arms. His explanation for running with the typewriter in his arms was that he was running after the unknown man to return the unwelcome gift. The Government, in rebuttal, produced a police officer who testified that during the alleged illegal detention the defendant told police that he and Payne had come to the hospital together by car. The officer's testimony was thus in direct conflict with the defendant's direct testimony that (a) he had come alone and (b) he was not acquainted with Payne. The United States Court of Appeals, District of Columbia Circuit, held the officer's testimony in rebuttal was competent for the limited purpose of consideration as bearing upon the credibility of the defendant's testimony as a witness. The conflicting testimony of the defendant and of the police officer, although it did not relate directly to any specific essential element of the crimes for which the defendant was on trial, related generally to events occurring at or about the time of the alleged crimes for which he was being tried.

Prior to *Miranda v. Arizona, supra,* which was decided June 13, 1966, other courts had reached conclusions in conflict with *Tate.* In *People v. Underwood,* 389 P. 2d 937 (Cal. 1964), the opinion of Chief Justice Gibson states: "It is also established in California and many other jurisdictions that involuntary *confessions* may not be used for purposes of impeaching the testimony of an accused. (Citations.) We believe a similar rule should operate to exclude involuntary *admissions* when they are offered for that purpose, and it has been so held in a number of jurisdictions. (Citations.) The credibility of an accused who takes the stand may be of critical importance to the trier of fact in determining whether or not a defense has been established, and we should not permit an accused's credibility to be attacked by use of an involuntary statement which would be inadmissible as affirmative evidence under the rule of *People v. Atchley, supra,* 53 Cal. 2d 160, 170, 346 P. 2d 764." Indeed, the Court of Appeals, District of Columbia Circuit, has substantially restricted the scope of *Tate* in *Johnson v. United States,*

344 F. 2d 163 (1964), and in *Inge v. United States,* 356 F. 2d 345 (1966).

In *Malloy v. Hogan,* 378 U.S. 1, 12 L. ed. 2d 653, 84 S. Ct. 1489, the Supreme Court of the United States, overruling prior decisions, held the privilege against self-incrimination guaranteed by the Fifth Amendment to the Constitution of the United States, namely, that no person "shall be compelled in any criminal case to be a witness against himself," is applicable to State action by virtue of the Due Process Clause of the Fourteenth Amendment.

In *Miranda v. Arizona, supra,* the Supreme Court of the United States considered the constitutional privilege against self-incrimination with reference to the admissibility of statements made by an accused person while in custody. This excerpt from the opinion of Mr. Chief Justice Warren is pertinent: "The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility *of any statement made by a defendant.* No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself *in any manner;* it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. *In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement."* (Our italics.) 384 U.S. at 477-478, 16 L. ed. 2d at 725, 86 S. Ct. at 1629.

Decisions subsequent to *Miranda,* holding that evidence obtained in violation of a defendant's constitutional privilege against self-incrimination is *not* admissible for impeachment purposes, include the following: *Wheeler v. United States,* 382 F. 2d 998 (10th Cir. 1967) (dictum); *Blair v. United States,* 401 F. 2d 387 (D.C. Cir. 1968); *Proctor v. United States,* 404 F. 2d 819 (D.C. Cir. 1968); *Groshart v. United States,* 392 F. 2d 172 (9th Cir. 1968); *United States v. Fox,* 403 F. 2d 97 (2d Cir. 1968); *State v. Brewton,* 422 P. 2d 581 (Or. 1967); *Commonwealth v. Padgett,* 237 A. 2d 209 (Pa.

1968). See also, *United States v. Pinto,* 394 F. 2d 470, 474-476 (3d Cir. 1968).

The question under consideration is discussed in two excellent law review articles, *viz.:* Comment, *The Impeachment Exception to the Exclusionary Rules,* 34 University of Chicago Law Review 939 (1967), and (2) Comment, *The Collateral Use Doctrine: From Walder to Miranda,* 62 Northwestern University Law Review 912 (1968).

In *Wheeler,* the opinion states: "While it is true that the court in *Miranda* was concerned with the admissibility of custodial statements as substantive proof of the facts related, we think the procedural safeguards prescribed there are equally important to a consideration of the admissibility of prior inconsistent statements for impeachment purposes. If the veracity of an accused person testifying in his own behalf is to be attacked by a prior inconsistent or contradictory statement made while he was under in-custody interrogation, we think it is reasonable to require the Government to meet the burden of showing that the statement was voluntarily made after the accused had been fully advised of all of his rights and had effectively waived them in accordance with the standards prescribed by *Miranda.* To hold otherwise would permit an unconstitutional invasion of an individual's rights to be used as a weapon to influence the jury's consideration of his trial testimony."

In *Blair,* the opinion states: "The teaching of *Walder,* however valid in other contexts, appears irrelevant when a *Miranda* problem is presented."

In *Proctor,* the opinion states: "Without considering whether the impeachment in this case was on a point sufficiently collateral to come within *Walder* and *Tate,* we hold that the *Walder-Tate* exception to the exclusionary rule does not apply to evidence obtained in violation of *Miranda.*"

In *Groshart,* the opinion states: "Whether the objective be to show guilt or to attack credibility, at the trial the prosecution must first show that the statements have been obtained in compliance with the constitutional requirements as defined by our highest court. Insofar as *Walder* would compel a different result, it has, we believe, been undermined by the Supreme Court's *Miranda* decision."

In *Fox,* the opinion quotes from *Miranda* the excerpt set forth above and the further statement in the *Miranda* opinion that "unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can

be used against him." 384 U.S. at 479, 16 L. ed. 2d at 726, 86 S. Ct. at 1630. The opinion in *Fox* continues: "These pronouncements by the Supreme Court may be technically dictum. But it is abundantly plain that the court intended to lay down a firm general rule with respect to the use of statements unconstitutionally obtained from a defendant in violation of *Miranda* standards. The rule prohibits the use of such statements whether inculpatory or exculpatory, whether bearing directly on guilt or on collateral matters only, and whether used on direct examination or for impeachment."

In *Brewton*, the opinion expresses the view that "any attempt in the future to restrict the exclusionary rule to the state's case in chief would be inconsistent with the constitutional principles which are inherent in the *Miranda* case . . ." After stating the opinion that the rule suggested in *Tate* was "virtually unworkable," the opinion concludes: "The state should be free to impeach, but it ought to come by its impeachment as legally as it accumulates its other evidence."

**[1, 2]** We are of the opinion, and so hold, that in-custody statements attributed to a defendant, when offered by the State and objected to by the defendant, are inadmissible *for any purpose* unless, after a *voir dire* hearing in the absence of the jury, the court, based upon sufficient evidence, makes factual findings that such statements were voluntarily and understandingly made by the defendant after he had been fully advised as to his constitutional rights. Hence, in the factual situation under consideration, Carswell's testimony, absent a *voir dire* hearing and factual determinations as indicated above, was not admissible either as substantive evidence or for impeachment purposes.

**[3]** We are in agreement with that portion of the decision of the Court of Appeals to the effect that the evidence, when considered in the light most favorable to the State, was sufficient to require submission to the jury as to the crimes charged in the bill of indictment. However, we are of the opinion, and so hold, that defendant is entitled to a new trial on account of the erroneous admission of Carswell's rebuttal testimony. Accordingly, the decision of the Court of Appeals is reversed and the cause is remanded to that Court with direction to award a new trial to be conducted in accordance with the legal principles stated herein.

Error and remanded.