STATE OF NORTH CAROLINA v. RICHARD WILLIAM ACCOR AND STATE OF NORTH CAROLINA v. WILLARD MOORE

No. 26

(Filed 31 July 1970)

1. **Criminal Law § 135; Burglary and Unlawful Breakings § 8— first degree burglary — capital punishment — validity — motion to quash**

    A motion to quash which purported to raise the question whether first degree burglary is punishable by death if the jury when rendering its verdict in open court fails to recommend that the punishment shall be imprisonment for life, *held* properly overruled in a prosecution for first degree burglary. G.S. 14-51; G.S. 14-52; G.S. 15-162.1.

2. **Burglary and Unlawful Breakings § 5— prosecution — sufficiency of evidence**

    In a prosecution charging two defendants with burglary in the first degree, the State's evidence was sufficient to support a jury finding that the defendants broke into and entered a home with the intent to take and carry away the personal property of the occupants, as alleged in the indictment, notwithstanding there was no evidence that defendants actually took or carried away any article of personal property from the home, since the evidence of defendants' breaking

and entering, together with evidence of their conduct in violently assaulting the occupants of the home, negated any suggestion that they had entered the home for a lawful purpose.

3. **Criminal Law § 176— appeal — review of nonsuit motion**

Admitted evidence, whether competent or incompetent, must be considered in passing upon defendants' motions under G.S. 15-173 for judgments as in case of nonsuit.

4. **Criminal Law § 66; Constitutional Law § 30— photographs — photographic identification of defendants — admissibility — violation of Fourth Amendment rights**

The photographs by which the defendants were identified as the perpetrators of first degree burglary, and the testimony of the circumstances surrounding the photographic identification of the defendants by the victims of the burglary, *are held* inadmissible on the ground that the photographs were taken in violation of the defendants' Fourth and Fourteenth Amendment rights, where (1) the defendants were picked up and brought to the police station without a warrant and without probable cause, (2) the evidence was silent as to the circumstances under which defendants were picked up and there was no evidence that either defendant voluntarily accompanied the officers, (3) the defendants were photographed prior to the issuance of warrants for their arrest, (4) at the time the photographs were taken there was no evidence to support a finding of probable cause of defendants' guilt, and (5) there was no evidence that one defendant consented to the taking of his photograph, and the evidence was insufficient to show that the other defendant voluntarily and understandingly consented to the taking of his photograph.

5. **Criminal Law § 66— taking of photographs of defendant — effect of statute**

G.S. 114-19 neither authorized nor prohibited police officers from taking fingerprints and photographs of defendants who had not been charged with a crime when the photographs were taken.

6. **Criminal Law § 66— photographs of defendant — statute — exclusionary rule**

The statute prohibiting law enforcement officers from taking photographs of persons charged with a misdemeanor, except in certain enumerated cases, does not create an exclusionary rule of evidence. G.S. 114-19.

7. **Criminal Law § 66— photographic identification of Negro defendants — suggestiveness in procedure — findings and evidence**

Evidence on *voir dire held* sufficient to support a finding that the procedure by which two Negro defendants were identified from photographs was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, where there was testimony that (1) the pictures of defendants were placed in an album containing pictures of other adult Negro males, (2) all of the photo-

State v. Accor and State v. Moore

graphs in the album were taken under identical conditions, and (3) the album was shown to the prosecuting witnesses singly.

8. **Criminal Law § 66— identification of defendant — voire dire**

When the State offers a witness whose testimony tends to identify the defendant as the person who committed the crime charged in the indictment, and the defendant interposes timely objection and requests a *voir dire* or asks for an opportunity to "qualify" the witness, such *voir dire* should be conducted in the absence of the jury and the competency of the evidence evaluated.

9. **Criminal Law § 66; Constitutional Law § 32— right to counsel — photographic identification of defendants**

The decisions in *U. S. v. Wade*, 388 U.S. 218, and in *Gilbert v. California*, 388 U.S. 263, which relate to right to counsel at a police identification lineup, will not be extended to out-of-court examinations of photographs including that of a suspect, whether the subject be at liberty or in custody.

10. **Criminal Law § 66; Constitutional Law § 37— photographs of defendant — waiver of Fourth Amendment rights — burden of proof**

Upon the *voir dire* to determine the voluntariness of defendant's consent to be photographed for identification purposes, the burden was on the State to establish that the defendant had waived his Fourth Amendment rights.

11. **Criminal Law § 66; Constitutional Law § 37— photographing of defendant for identification — voluntariness of defendant's consent**

Although a police officer read the Miranda warnings to defendant prior to the photographing of defendant for identification purposes, nonetheless the circumstances surrounding defendant's affirmative response to the officer's request for the taking of photographs cannot support an inference that the defendant's response was voluntarily and understandingly made, where the defendant had been picked up and brought to the police station without a warrant and without probable cause, and the defendant was not advised that he could leave the station without having to submit to the taking of the photographs.

12. **Criminal Law § 66— photographs of defendant — use for identification — assumption of illegality**

In the absence of evidence and findings that the defendants' photographs used for identification purposes were lawfully obtained, it will be assumed that the defendants were being unlawfully detained at the police station when their photographs were taken.

13. **Criminal Law § 66— unlawfully obtained photographs of defendants — validity of in-court identification of defendants — finding of fact**

Although unlawfully obtained photographs of defendants, and the evidence of defendants' identification from the photographs, were rendered inadmissible at trial when they were offered by the State and objected to by the defendants, it did not necessarily follow that the

in-court identifications were incompetent; the trial court had to determine the question of fact whether the State had offered clear and convincing evidence that the in-court identifications of defendants originated independently of the tainted photographs.

APPEAL by defendants from *May, Special Judge,* May 26, 1969 Session of GASTON Superior Court, docketed and argued as No. 55 at Fall Term 1969.

Defendants were prosecuted upon the following bill of indictment, *viz.*:

"THE JURORS FOR THE STATE UPON THEIR OATH PRESENT, That Richard William Accor and Willard Moore late of the County of Gaston on the 4th day of March, 1969, about the hour of 2:15 a.m. in the night of the same day, with force and arms, at and in the county aforesaid, the dwelling house of one Mr. and Mrs. Witt Martin, 1609 Jackson Road, Gastonia, North Carolina, there situate, and then and there actually occupied by Mr. and Mrs. Witt Martin, James Martin, Elizabeth Martin Carson feloniously and burglariously did break and enter, with intent, the goods and chattels of the said Mr. and Mrs. Witt Martin, James Martin, Elizabeth Martin Carson in the said dwelling house then and there being, then and there feloniously and burglariously to steal, take and carry away clothing, goods, and other personal property of Mr. and Mrs. Witt Martin, James Martin and Elizabeth Martin Carson against the peace and dignity of the State."

Upon arraignment thereon, each defendant pleaded not guilty. At arraignment and at trial, each defendant was represented by court-appointed counsel, Accor by Tim L. Harris, Esq., of the Gaston Bar, and Moore by Steve Dolley, Esq., of the Gaston Bar.

Narrated below is a brief summary of the State's evidence *as to what occurred* on the occasion of the alleged burglary.

The dwelling house at 1609 Jackson Road, Gastonia, N. C., in which Mrs. Elizabeth Martin Carson, aged 52, and her parents, Mr. and Mrs. Witt Martin, each aged 75, resided, was broken into and entered by two Negro men about 2:15 a.m., on Tuesday, March 4, 1969. At that time, James Martin, aged 47, Elizabeth's brother, was also an occupant of the house.

Elizabeth was awakened by a noise "like somebody was slitting a screen," and then heard glass falling in the kitchen, "just across" from her bedroom. Thereupon, she got out of bed, "jerked the door open," went into the hall and screamed loudly for her father. Witt Martin "came running out" into the hall and Elizabeth told him, "Someone's breaking in." From the hall, Witt Martin reached just inside the kitchen and switched on the kitchen light. In the bright light of the kitchen's 14-inch fluorescent light, father and daughter saw two Negro men in the kitchen.

The two men attacked Witt Martin and knocked him back through the hall and into Elizabeth's bedroom. When James Martin, who had been aroused by Elizabeth's screams, came into the hall or kitchen, the intruders grabbed him and one of them stabbed him "with a long switchblade knife." Witt Martin, armed with a vanity stool, emerged from his daughter's bedroom and attacked the man who was stabbing his son. The other (younger) man was attempting to hold James Martin, who had grabbed the arm of his assailant and was struggling to defend himself. Elizabeth, with a telephone, was pounding this younger man until he grabbed her and with her head under his arm dragged her across the kitchen and back porch and down the steps. The melee continued until a next-door neighbor turned on his flood light. When this occurred, the intruders fled.

The violent encounter took place in the kitchen and hall. Estimates as to how long it lasted varied from 3-4 minutes (Witt Martin) to 10 minutes (Mrs. Carson). The hall itself was lighted only by a night-light. However, when the kitchen light was on, there was plenty of light both in the kitchen and in the entrance of the hall.

Responding to a call, Officer Truelove of the Gastonia Police Department, went to the residence at 1609 Jackson Road.

On March 5, 1969, each defendant was photographed by Eugene Posey, Captain of the Detective Division, at the Gastonia Police Department. These photographs, together with those of eleven other adult Negro males, were placed in an album. The album was taken by Captain Posey to the Carson-Martin residence about 4:00 p.m. on Thursday, March 6, 1969, and shown separately to each member of the family. Witt Martin identified, as the photographs of the two Negro men who had broken into and entered the Carson-Martin residence about 2:15 a.m. on

March 4, 1969, the photographs of both Accor and Moore; James Martin also identified the photographs of both Accor and Moore; Mrs. Carson identified the photograph of Accor and no other; Mrs. Witt Martin (who did not testify at trial) identified the photograph of Moore and no other.

Based on the identifications of the photographs of defendants by the Martins and Mrs. Carson, warrants were issued and defendants were arrested for the alleged burglary.

Neither defendant had counsel when his photograph was taken on March 5th or when the identifications of photographs were made at the Carson-Martin residence on March 6th. Thereafter, on March 11, 1969, the court, having determined that each defendant was an indigent, appointed counsel for each defendant.

A preliminary hearing for each defendant was conducted on April 10, 1969. Posey testified: "To my knowledge, the first time they (Mrs. Carson and the Martins) saw them (defendants) in person was at the preliminary hearing."

Additional facts relating to the circumstances under which the photograph of each defendant was taken, and to the admission in evidence of the album and of testimony relating to the out-of-court identifications of the photographs of defendants, will be set forth in the opinion.

Witt Martin, James Martin and Mrs. Carson, as witnesses at trial, identified defendants as the two Negro men who broke into and entered the Carson-Martin residence about 2:15 a.m. on March 4th. In addition, the State offered in evidence, and the court admitted over defendants' objections, testimony of these witnesses and also of Captain Posey as to the above-stated identifications of photographs of defendants on March 6th. In addition, the State offered in evidence the album ( State's Exhibit No. 15) "for the purpose of corroborating the evidence of Mrs. Carson, Mr. James Martin, Mr. Witt Martin, and Officer Posey." Overruling defendants' objections, the court admitted in evidence the album. In doing so, the court gave this instruction: " (T)he State seeks to offer into evidence the State's Exhibit No. 15 for the purpose of corroborating the testimony of the witnesses, Mrs. Elizabeth Martin Carson, Mr. Witt Martin, Mr. James Martin and Captain Posey, if you find in fact, that it does corroborate the testimony of these witnesses whom I

have named. You will not consider this document as substantive evidence, if you find, in fact, that it does corroborate one or more of these witnesses."

Each defendant testified and denied involvement in any incident at the Carson-Martin residence. The testimony of each defendant and of witnesses offered in his behalf tended to establish an alibi.

As to each defendant, the jury returned a verdict of guilty of burglary in the first degree with recommendation that the punishment be imprisonment for life in the State's prison. In accordance with the verdicts, the court, as to each defendant, pronounced judgment "that the defendant be imprisoned for the term of his natural life in the State's Prison in Raleigh, N. C." Each defendant excepted to the judgment and gave notice of appeal.

Thereafter, the court was advised that private counsel had been retained to represent defendants; and, in accordance with their motions, the court entered orders allowing Messrs. Dolley and Harris to withdraw as counsel for the respective defendants. On appeal, defendants are represented by privately retained counsel.

*Attorney General Morgan, Deputy Attorney General Moody and Assistant Attorney General Harrell for the State.*

*Chambers, Stein, Ferguson and Lanning for defendant appellants.*

BOBBITT, C. J.

On May 13, 1970, this case was remanded to the Superior Court for appropriate proceedings to correct patent errors appearing on the face of its minutes. *State v. Accor and State v. Moore*, 276 N.C. 567, 173 S.E. 2d 775. In accordance with our directions, such proceedings were conducted in Gaston Superior Court; and on June 25, 1970, based on findings of fact set forth therein, an order was entered by Ervin, J., correcting the patent errors which had appeared in the minutes of the May 26, 1969 Session. A certified copy of this order is incorporated in the record on appeal. The corrected record shows unequivocally that the pleas, verdicts, and judgments were as set forth in our preliminary statement and that the alternate jurors were excused before the jury, consisting of the original twelve, com-

menced deliberations as to their verdict. Indeed, the briefs filed by defendants and by the State prior to oral argument at our Fall Term 1969 are based on this premise and contain no reference to the now-corrected patent errors.

[1] Each defendant assigns as error the court's denial of his motion to quash the indictment. Defendants' contentions purporting to support these assignments bear upon whether the *death penalty* provisions of G.S. 14-51, G.S. 14-52 and G.S. 15-162.1, relating to burglary in the first degree, in force on March 4, 1969, were invalid. Unquestionably, the indictment charges burglary in the first degree as defined in G.S. 14-51. Whether burglary in the first degree is punishable by death if the jury when rendering its verdict in open court *fails to recommend* that the punishment shall be imprisonment for life in the State's prison, is not presented by the motions to quash. These motions were properly overruled.

[2] Each defendant assigns as error his motion(s) to dismiss as in case of nonsuit. The gist of defendants' contention is that the evidence is insufficient to support a finding that the two Negro men who broke into and entered the Carson-Martin residence at 1609 Jackson Road on March 4, 1969, about 2:15 a.m., did so feloniously and burglariously *with the intent* "to steal, take and carry away clothing, goods, and other personal property of Mr. and Mrs. Witt Martin, James Martin and Elizabeth Martin Carson . . . ."

There was plenary evidence the residence contained numerous articles of personal property of value owned by the occupants. There was no evidence either defendant actually took and carried away any such article of personal property. The breaking and entering were immediately detected; the intruders were confronted in the brightly lighted kitchen by Mrs. Carson and by Witt Martin; the intruders then attacked Witt Martin, James W. Martin and Mrs. Carson; and all were engaged in physical combat until M. B. Cloninger, the next-door neighbor, responded to pleas for help by turning on the flood light on the corner of his house, at which time the intruders fled.

In *State v. Allen,* 186 N.C. 302, 306, 119 S.E. 504, 506, Stacy, C. J., said: "(B)urglary in the first degree, under our statute, consists of the intent, which must be executed, of breaking and entering the presently occupied dwelling-house or

sleeping apartment of another, in the nighttime, with the further concurrent intent, *which may be executed or not,* then and there to commit therein some crime which is in law a felony. This particular, or ulterior, intent to commit therein some designated felony, as aforesaid, must be proved, in addition to the more general one, in order to make out the offense." (Our italics.)

In *State v. Thorpe,* 274 N.C. 457, 464, 164 S.E. 2d 171, 176, Higgins, J., for the Court, said: "The indictment having identified the intent necessary, the State was held to the proof of that intent. Of course, intent or absence of it may be inferred from the circumstances surrounding the occurrence, but the inference must be drawn by the jury."

According to uncontradicted evidence: When the intruders, then in the brightly lighted kitchen, were first confronted, Witt Martin asked: "What do you want?" The intruders made no reply but "just started hitting." The conduct of the intruders negates any suggestion that they entered the Carson-Martin residence for any lawful purpose. Moreover, their conduct discloses affirmatively that they were fully aware of and participated in events requiring mental quickness as well as physical dexterity.

In 13 Am. Jur. 2d Burglary § 52, entitled "Intent," the author says:

"Intent is a state of mind existing at the time a person commits an offense. If intent required definite and substantive proof, it would be almost impossible to convict, absent facts disclosing a culmination of the intent. The mind of an alleged offender, however, may be read from his acts, conduct, and inferences fairly deducible from all the circumstances.

"There is a lack of unanimity of opinion among the courts on the question whether the intent to commit larceny in connection with a burglary charge must be affirmatively shown to exist as distinct from some other offense which might have been intended. Numerous cases, however, hold that an unexplained breaking and entering into a dwelling house in the nighttime is in itself sufficient to sustain a verdict that the breaking and entering was done with the intent to commit larceny rather than some other felony. The fundamental theory,

in the absence of evidence of other intent or explanation for breaking and entering, is that the usual object or purpose of burglarizing a dwelling house at night is theft."

In *State v. McBryde*, 97 N.C. 393, 1 S.E. 925, the evidence failed to show that the intruder had disturbed any of the personal property within the residence. The evidence was held sufficient to withstand the defendant's motion to dismiss as in case of nonsuit. Davis, J., for the Court, said: "The intelligent mind will take cognizance of the fact, that people do not usually enter the dwellings of others in the nighttime, when the inmates are asleep, with innocent intent. The most usual intent is to steal, and when there is no explanation or evidence of a different intent, the ordinary mind will infer this also. The fact of the entry alone, in the nighttime, accompanied by flight when discovered, is some evidence of guilt, and in the absence of any other proof, or evidence of other intent, and with no explanatory facts or circumstances, may warrant a reasonable inference of guilty intent. Here there was no larceny or other felony actually committed, and the guilt, if any, consisted in the *intent* to commit a felony, which was not consummated." Accord: *State v. Hargett*, 196 N.C. 692, 146 S.E. 801; *State v. Oakley*, 210 N.C. 206, 186 S.E. 244.

We hold the evidence was sufficient for submission to the jury upon the allegations contained in the indictment, and that it was for the jury to determine, under all the circumstances, whether the defendants or either of them had the ulterior criminal intent at the time of breaking and entering to commit the felony charged in the indictment.

[3] Since a new trial is awarded for error in the admission of evidence, it is here noted that *admitted* evidence, whether competent or incompetent, must be considered in passing on defendants' motions under G.S. 15-173 for judgments as in case of nonsuit. *State v. Virgil*, 263 N.C. 73, 138 S.E. 2d 777, and cases cited; *State v. Walker*, 266 N.C. 269, 145 S.E. 2d 833; *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679.

[4] Decision on this appeal turns on whether the court committed prejudicial error by admitting, over defendants' objections, the testimony relating to the out-of-court identifications on March 6th of the photographs of defendants, the album con-

taining these photographs, and the in-court identifications of defendants by Witt Martin, James Martin and Mrs. Carson.

Mrs. Carson was asked on direct examination whether she could identify in court the two Negro men who had broken into and entered the Carson-Martin residence. Counsel for each defendant objected and requested an opportunity to "qualify" the witness. In the absence of the jury, a *voir dire* hearing was conducted. At the conclusion thereof, Judge May made and entered the following findings of fact and conclusions of law, *viz.* :

### "FINDINGS OF FACT

"1. In the absence of the jury, evidence was introduced, at length, by the State and the witnesses offered by the State were examined and cross-examined, both by the Solicitor for the State and by counsel for the respective defendants, Willard Moore and Richard Accor, with respect to an album containing thirteen photographs.

"2. That the witness, Captain Eugene Posey, testified that eleven photographs were removed from the police identification files which had been made prior to March 4, 1969, and that on March 5th, pictures were made of the defendants, Moore and Accor; that these pictures were placed in the album in positions Nos. 5 and 11.

"3. That there were no numbers, code, or otherwise placed on said photographs to indicate who any particular person was in a specified photograph; that each photograph was taken in the identical location in the City of Gastonia Police Department and that each person so photographed was taken from a front view and a side view and furthermore that each person so photographed had a chain around the neck with a placard hanging down on the chest; that this chain and placard appeared in each photograph and that the information contained on the placard of all thirteen photographs was covered by tape and unavailable to be seen or identified.

"4. That no photograph of either defendant was contained in the album which was made on or prior to March 4, 1969, but, in fact, the pictures or photographs of both defendants contained in the album were made on the morning of March 5, 1969;

that there was no marking or identification of any kind to indicate what date any particular one of the thirteen photographs had been made.

"5. That Mr. James Martin examined the album first and did so alone and that no other member of the family or any other person was present at the time he looked at the album who might have influenced him in making or failing to make an identification of either one or both of the defendants.

"6. That this procedure was likewise followed when Mrs. Witt Martin examined the album, when Mr. Witt Martin examined the album, and Mrs. Elizabeth Martin Carson examined the album.

"7. That at the time the two defendants named above were photographed on March 5, 1969, neither of said defendants had counsel appointed by the Court or privately employed but that at the time the officer, Captain Eugene Posey, first approached the defendants, he read to them what he described as their rights from a card which he was carrying on his person which reads, as follows: 'You have a right to communicate with friends or relatives. You have a right to counsel and if you cannot afford counsel, the Court will appoint counsel for you. You do not have to make any statement in the absence of counsel. You are not compelled to answer any question and you may stop answering questions at any time. Any statement or admission made by you can be used against you.'

"8. That at the time they were photographed, neither defendant was charged with the commission of any crime and at the time they were advised of their rights, neither of the defendants was advised that he was a suspect in this case but rather the conversation with the police at the time concerned investigation of an offense of receiving stolen goods, said goods have (*sic*) been stolen as a result of a breaking and entering of a residence, of which neither defendant is at this time presently under indictment.

"9. At the time the photograph album was shown to the Martins and Mrs. Carson, neither of the defendants had been advised that the photographic album was being shown to the Martins nor were either of the defendants present when the photographic album was being shown to the Martins nor did

either of the defendants at the time the photographic album was being shown to the Martins have legal counsel, either appointed or privately employed, present or elsewhere.

"10.   That Captain Eugene Posey is an officer of the City of Gastonia Police Department, particularly charged with the responsibility of being the head of the City Detectives, and, as such, is directly responsible to the Chief of Police of the City of Gastonia and works for him and under his direction and supervision.

"11.   That the pictures of all the thirteen persons in the album were of adult male Negroes.

"12.   That all of the photographs were identical in that they constituted a photograph of the individual from the waist to and above the top of his head, from the front view and the side view.

"13.   That the warrants for the defendants which were issued in this case were issued based upon information and identification received from Mr. and Mrs. Martin, Mrs. Elizabeth Martin Carson, and Mr. James Martin, said identification having been made as a result of viewing the thirteen photographs in the album presented to them by Captain Posey and Sergeant Mark Carswell on March 7 (*sic*), 1969.

"14.   That the original identification of both of the defendants, Moore and Accor, made by Mr. and Mrs. Witt Martin, Mr. James Martin, and Mrs. Elizabeth Martin Carson were made from the photographs contained in the album hereinabove mentioned.

"15.   That there was no police lineup arranged for the identification of the defendants, Moore and Accor, in the sense that any living person or persons were physically exhibited for identification to Mr. and Mrs. Witt Martin, Mr. James Martin, and Mrs. Elizabeth Martin Carson.

## "CONCLUSIONS OF LAW

"Upon the foregoing Findings of Fact, the Court concludes as a matter of law that the out-of-court identifications of the defendants, Moore and Accor, by Mr. and Mrs. Witt Martin, Mr. James Martin, and Mrs. Elizabeth Martin Carson were lawful."

Each defendant moved to suppress all evidence relating to the photographs and all in-court identifications by persons whose original identification was made on March 6th from the photographs. During the *voir dire* hearing, and at the conclusion thereof, defendants' counsel contended, *inter alia*, (1) that the photographs were taken in violation of G.S. 114-19; (2) that the photographic identifications were illegal because there was a "lineup in disguise" when counsel for defendants were not present; (3) that the in-court testimony was "tainted" by the March 6th identifications of the photographs; and (4) that there was no evidence the photographs were taken "constitutionally."

G.S. 114-19 in part provides: "Every chief of police and sheriff in the State of North Carolina is hereby authorized to take, or cause to be taken, the fingerprints and photographs of any person charged with the commission of a felony and of any person who has been committed to jail or prison upon conviction of a crime. No officer shall take the photograph of a person arrested and charged with a misdemeanor, unless such person is a fugitive from justice or unless such person shall, at the time of arrest, have in his possession property or goods reasonably believed by such officer to have been stolen, or unless the officer has reasonable grounds to believe that such person is wanted by the Federal Bureau of Investigation, the State Bureau of Investigation or some other law enforcement officer or agent."

[5, 6]    In view of the express finding that, "at the time they were photographed, neither defendant was charged with the commission of any crime," G.S. 114-19 neither authorized nor prohibited the taking of the fingerprints and photographs of defendants. Moreover, we approve the holding in recent decisions of the Court of Appeals (*Chapman v. State,* 4 N.C. App. 438, 166 S.E. 2d 873; *State v. Strickland,* 5 N.C. App. 338, 168 S.E. 2d 697) that this statute did not create an exclusionary rule of evidence. *State v. McGee,* 214 N.C. 184, 198 S.E. 616, and cases cited; 29 Am. Jur. 2d Evidence § 408.

[7]    Judge May concluded that the "out-of-court identifications of the defendants" from photographs *were lawful.* When considered with the court's findings of fact, we interpret this conclusion as a finding by the court that "the photographic identification procedure" was *not* "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

State v. Accor and State v. Moore

*Simmons v. United States,* 390 U.S. 377, 384, 19 L.ed. 2d 1247, 1253, 88 S. Ct. 967, 971. Cf. *Stovall v. Denno,* 388 U.S. 293, 301-302, 18 L.ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972. Although the album was not included in the record on appeal, seemingly the evidence on *voir dire* was sufficient to support this finding. However, the court's findings are not determinative of crucial factual questions discussed below.

[8]    When the State offers a witness whose testimony tends to identify the defendant as the person who committed the crime charged in the indictment, and the defendant interposes timely objection and requests a *voir dire* or asks for an opportunity to "qualify" the witness, such *voir dire* should be conducted in the absence of the jury and the competency of the evidence evaluated. Upon such hearing, if the in-court identification by a witness is challenged on the ground it is tainted by an unlawful out-of-court photographic or corporeal identification, all relevant facts should be elicited and all factual questions determined, including those involving the defendant's constitutional rights, pertinent to the admissibility of the proffered evidence. Under the circumstances of this case, we think the objections interposed were sufficient to entitle defendants to an evaluation of the competency of the evidence to which they objected with reference to their Fourth Amendment and Sixth Amendment rights. See *State v. Pike,* 273 N.C. 102, 159 S.E. 2d 334, and cases cited; *State v. Catrett,* 276 N.C. 86, 171 S.E. 2d 398, and cases cited.

No factual determination was made and meager evidence was elicited with reference to whether either Accor or Moore was in custody at the time of the photographic identifications. The few fragments of evidence bearing thereon indicate Moore was released but leave in doubt whether Accor was released after they were fingerprinted and photographed on March 5th. However, defendants contend, based on *United States v. Wade,* 388 U.S. 218, 18 L.ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert v. California,* 388 U.S. 263, 18 L.ed. 2d 1178, 87 S. Ct. 1951, that the photographic identifications on March 6th constituted a "critical stage" in the prosecution and that, because defendants were not then represented by counsel, their Sixth Amendment rights to counsel were violated. Since the question will probably arise at the next trial, we deem it appropriate to consider this contention.

If either defendant was released without charge after his fingerprints and photographs were taken, and was at liberty on March 6th, there exists a unanimity of opinion to the effect that his Sixth Amendment rights were not violated by the absence of counsel when the photographic identifications were made. Moreover, in our view, if either defendant was in actual custody but with no charge against him related to the alleged burglary when the photographic identifications were made which led to the issuance of a warrant and his arrest on the burglary charge, his Sixth Amendment rights were not violated solely because he was not represented by counsel when such photographic identifications were made. Pertinent decisions include the following: *United States v. Conway*, 415 F. 2d 158 (3d Cir. 1969) ; *United States v. Marson*, 408 F. 2d 644, 649-650 (4th Cir. 1968) ; *United States v. Bennett*, 409 F. 2d 888 (2d Cir. 1969) ; *McGee v. United States*, 402 F. 2d 434, 436 (10th Cir. 1968) ; *United States v. Cunningham*, 423 F. 2d 1269 (4th Cir. 1970). In Conway, the defendants were in custody when the photographic identifications were made. In Marson, the defendant was in custody when the photographic identifications were made but it was held that, under *Stovall v. Denno, supra*, Wade and Gilbert did not apply because the photographic identifications were made prior to those decisions. In Bennett and McGee, it is unclear whether the defendant was in custody when the photographic identifications were made. In Cunningham, the defendant was not in custody when the photographic identifications were made. It is noted that in *Thompson v. State*, 451 P. 2d 704 (Nev. 1969), it was held in a split decision (three to two) that Wade and Gilbert were applicable in respect of photographic identifications when the defendant was in actual custody. (Note: The dissenting opinion of Winter, J., in Marson, is to the same effect.) However, in Thompson, the conviction was upheld on the ground there was evidence sufficient to support the finding of the trial judge, made immediately after a hearing held in the absence of the jury, that "the State had proven by clear and convincing evidence that the in-court identification was based on the prolonged and thorough observation of the robber at the holdup."

[9] In our view, the doctrine of Wade and Gilbert *should not be extended* to out-of-court examinations of photographs including that of *a suspect*, whether the suspect be at liberty or in custody. We shall adhere to this view unless and until the Supreme Court of the United States enunciates such an extension

of the Wade and Gilbert doctrine. Thus, the award of a new trial herein is not based on the ground that defendants were not represented by counsel on the occasion of the photographic identifications on March 6th.

[4] Each defendant contends his photograph was taken when he was being unlawfully detained by the police; and that, having been obtained in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, the photograph was not admissible in evidence. He relies largely on *Davis v. Mississippi,* 394 U.S. 721, 22 L.ed. 2d 676, 89 S. Ct. 1394.

In Davis, the police were investigating the rape of an elderly woman by a young Negro. Davis, a 14-year-old youth, had worked for the victim as a yardboy. Police officers, without warrants, took twenty-four or more Negro youths, including Davis, to police headquarters where each was questioned briefly, fingerprinted, and then released without charge. As to Davis, this occurred on December 3rd, at which time there was no probable cause for his arrest. The State made no claim Davis "voluntarily accompanied the police officers to headquarters on December 3 *and* willingly submitted to fingerprinting." (Our italics.) Later, December 12th through December 14th, Davis was confined and fingerprinted again. It was found that Davis' fingerprints matched the latent prints taken from the window of the victim's home.

In Davis, the court held: (1) The taking of Davis' fingerprints during his illegal detention constituted an unreasonable seizure of his person in violation of the Fourth Amendment; and (2) that, notwithstanding its relevancy and trustworthiness as an item of proof, the illegally seized evidence was inadmissible at trial. The exclusionary rule, judicially declared by the Supreme Court of the United States, renders inadmissible evidence obtained in violation of a person's constitutional rights and applies equally to criminal prosecutions in State and Federal Courts. Mr. Justice Brennan states as the reason therefor the following: "The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment. To make an exception for illegally seized evidence which is trustworthy would fatally undermine these purposes." *Id.* at 724, 22 L.ed. 2d at 679, 89 S. Ct. at 1396. Rejecting the argument "that the detention occurred during the investigatory rather than accusatory stage and thus was not a

seizure requiring probable cause," Mr. Justice Brennan said: "It is true that at the time of the December 3 detention the police had no intention of charging petitioner with the crime and were far from making him the primary focus of their investigation. But to argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment.   Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.' " *Id.* at 726, 22 L.ed. 2d at 680, 89 S. Ct. at 1397.

In accord with Davis: *Bynum v. United States,* 262 F. 2d 465 (D.C. Cir. 1958), and *Mills v. Wainwright,* 415 F. 2d 787 (5th Cir. 1969), involving fingerprints; *Bradford v. United States,* 413 F. 2d 467 (5th Cir. 1969), involving exemplars of handwriting.

The evidence relating to the circumstances under which the photographs were taken discloses the following:

Captain Posey testified he first saw Accor on March 5th at his home on Middle Street; that he had opportunity to talk with Accor's mother and took her statement; that he read to Accor from a card the Miranda warnings when "we picked him up"; and that Accor's photograph was taken about 10:30 a.m. He testified he went to Moore's home; that Moore was not at home and that he talked with Moore's mother; that he did not pick up Moore but "left word"; that Moore was brought into his (Posey's) office by another officer "near dark on the 5th"; and that he advised Moore of his rights by reading the Miranda warnings from the same card.

When defendants were picked up, brought in, fingerprinted and photographed, no warrants had been issued for their arrest; there was no evidence sufficient to support a finding of probable cause of their guilt *of any crime;* and there was no evidence that either defendant *voluntarily* accompanied the officers to the police department.

Nothing in the record suggests that Accor consented at any time to the taking of his photograph.

[10, 11]   Captain Posey testified he asked Moore if he had "any

objections for us fingerprinting and photographing him"; that Moore said, "he did not"; and "that's when I taken his picture." Whether this statement attributed to Moore was made voluntarily, understandingly and intelligently was for factual determination by the court in the light of all the circumstances. *State v. Moore*, 275 N.C. 141, 166 S.E. 2d 53, and cases there cited. The court did not make such a factual determination. The burden was upon the State to establish a waiver by Moore of his Fourth Amendment rights. *State v. Little*, 270 N.C. 234, 154 S.E. 2d 61, and cases cited. He had been picked up and brought to the police station, without a warrant and without probable cause. Although the Miranda warnings were read to him, he was not advised he was free to leave police headquarters without submitting to the taking of his fingerprints and photographs. Nothing else appearing, it would seem unreasonable under these circumstances to infer that Moore's response "was sufficiently an act of free will to purge the primary taint" of the unlawful seizure. *Wong Sun v. United States*, 371 U.S. 471, 486, 9 L.ed. 2d 441, 454, 83 S. Ct. 407, 416-417.

Captain Posey testified that, when Accor's picture was taken, Accor was under arrest for the misdemeanor of receiving stolen goods. However, the record contains no warrant with reference to such a charge. Nor does it contain evidence relating to such a charge. Testimony that Accor was under arrest for receiving stolen property is in conflict with the court's finding that "neither defendant was charged with the commission of any crime and at the time they were advised of their rights, neither of the defendants was advised that he was a suspect in this case but rather the conversation with the police at the time concerned *investigation* of an offense of receiving stolen goods, said goods having been stolen as a result of a breaking and entering of a residence, of which neither defendant is at this time presently under indictment." (Our italics.)

Since each defendant was picked up and brought to police headquarters without a warrant and without probable cause, the burden was on the State to disclose fully and fairly all facts and circumstances surrounding their seizure and show compliance with defendants' Fourth Amendment rights. *State v. Little, supra; Beck v. Ohio,* 379 U.S. 89, 13 L.ed. 2d 142, 85 S. Ct. 223; *State v. Morales,* 176 N.W. 2d 104 (Minn. 1970).

[12]   The evidence is silent as to the circumstances under which

defendants were picked up and brought to police headquarters. The court made no finding that photographs of defendants were lawfully obtained. Nor was there evidence sufficient to support such a finding. In the absence of such evidence and findings, it must be assumed that each defendant was being unlawfully detained when his photograph was taken. Thus, the photographs and evidence relating thereto, *when offered by the State and objected to by defendants,* were inadmissible at trial. The probative impact of the album *and* the testimony relating to the identifications of the photographs of defendants was more prejudicial to defendants than the testimony alone would have been. The jury could see that the men on trial were the men whose photographs were identified on March 6th by Witt Martin, James Martin and Mrs. Carson. This very fact would tend to divert attention from the crucial question, that is, whether defendants or either of them was in the Carson-Martin residence during the early hours of March 4th.

[13] On this record, we must assume that the photographs were taken in violation of defendants' Fourth Amendment rights. While this rendered these photographs and the evidence relating thereto inadmissible at trial *when offered by the State and objected to by defendants,* it did not necessarily follow that the in-court identifications were incompetent. Defendants challenged the in-court identification testimony on the ground it was tainted by the out-of-court photographic identifications. This raised a question of fact for determination *by the court* at the conclusion of the *voir dire* hearing. *Bradford v. United States, supra,* at 472. The court made no finding of fact purporting to resolve this question. The admissibility of the in-court identifications depended upon whether the State was able to satisfy the court "by clear and convincing evidence," *United States v. Wade, supra* at 239, 18 L.ed. 2d at 1164, 87 S. Ct. at 1939, that the in-court identifications were of independent origin, that is, based on observations made at the scene of the burglary and untainted by any illegality underlying the photographic identifications.

In *State v. Blackwell,* 276 N.C. 714, 174 S.E. 2d 534, the prosecutrix identified the photograph of the defendant as that of one of three persons who had raped her. There was no evidence as to when and under what circumstances the photographs were taken. The photograph was picked out by the prosecutrix from a number of pictures exhibited to her. At trial, the defendant interposed no objection when the State offered

the in-court identification of the defendant by the prosecutrix. The evidence relating to the out-of-court and apparently pre-arrest identification of the defendant's photograph by the prosecutrix was elicited on cross-examination by the defendant's counsel. Branch, J., for this Court, calling attention to the Wade and Gilbert decisions, noted: "In Wade, the defendant's counsel moved to strike the courtroom identification after the confrontation testimony was elicited on cross-examination. In Gilbert, defendant's counsel moved, in the absence of the jury, to strike as soon as the in-court testimony was offered. In the instant case no such motion was ever made."

In the present case, each defendant consistently objected to the in-court identification testimony of Witt Martin, James Martin and Mrs. Carson; objected to all testimony relating to the out-of-court identification of the photographs of defendants by these witnesses; and objected to the introduction of the album. For error in the admission thereof, each defendant must be awarded a new trial. *Adams v. United States,* 399 F. 2d 579 (D.C. Cir. 1968).

At such new trial, when the State offers the testimony of Witt Martin, James Martin and Mrs. Carson, or any one or more of them, to identify defendants as the persons who burglarized their residence on March 4th, and defendants object to such in-court identifications and request a *voir dire* hearing, the court must determine *de novo* whether defendants or either of them were unlawfully detained at the Gastonia Police Station when their fingerprints and photographs were taken. In making this determination, the court will consider any evidence that may be offered by the State tending to show defendants or either of them waived their Fourth Amendment rights and voluntarily, understandingly and intelligently consented to their being pho-tographed at the Gastonia Police Station. Irrespective of its determination as to whether defendants or either of them were unlawfully detained when the photographs were taken, the court must determine upon the evidence *then* before it whether "the photographic identification procedure" was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra.* Whatever the indicated prior determinations may be with ref-erence to the out-of-court photographic identifications, the court must make an additional factual determination as to whether the State has established by clear and convincing proof that the

in-court identifications were of independent origin and were untainted by the illegality, if any, underlying the photographic identifications.

Upon the present record, we are unable to say that the State has shown "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 17 L.ed. 2d 705, 710, 87 S. Ct. 824, 828. The testimony of the eyewitnesses is the only evidence offered by the State that tends in any way to identify defendants or either of them as the persons who committed the burglary charged in the bill of indictment.

Since a new trial is awarded on the grounds stated above, we do not discuss defendants' contention, based on numerous exceptions, that the comments and conduct of the State throughout the trial were calculated to and had the effect of depriving defendants of a fair and impartial trial. We express the hope that the manner in which the next trial is conducted will afford no basis for such a contention.

New trial.