STATE v RILEY PATE.

*Indictment for Murder—Indictment, Sufficiency of—Time of Homicide—Variance.*

1. An indictment for murder which sets out the name and county of residence of the accused, the date of the homicide, the averment "with force and arms," the county in which the homicide was committed and that the defendant feloniously, wilfully and of his malice aforethought did kill and murder the person alleged to have been killed "against the form of the Statute in such case made and provided and against the peace and dignity of the State," is sufficient under Chapter 58, Acts of 1887, and is not defective for failure to allege whether the person killed was a man or woman, or whether the mortal wound was inflicted by stabbing, shooting or killing.

2. Where an indictment for murder charged the killing to have taken place December 5, 1896, and the evidence showed that, while the deceased was wounded on that day, he died three days thereafter, and before the bill of indictment was found; *Held*, that the variance was not fatal.

INDICTMENT for murder, tried before *Greene, J.*, and a jury at Fall Term, 1897, of MITCHELL Superior Court.

The indictment was as follows : "The jurors for the State upon their oaths present that Riley Pate, late of the county of Yancey, on the 5th day of December, 1896, with force and arms, at and in the county aforesaid, unlawfully, wilfully, feloniously, and of his malice aforethought, did kill and murder one Mat Hensley, against the form of the Statute in such case made and provided, and against the peace and dignity of the State." After arraignment, prisoner's counsel moved to quash (1) because there is no charge in the indictment that prisoner killed a reasonable creature in being: (2) that prisoner is not informed as to the manner of the death,—whether by poisoning, stabbing or shooting; (3) he is not informed whether he is charged with killing a man or a woman. Motion refused; and prisoner excepted.

The first witness testified that deceased was shot Decem-

ber 5, 1896, but did not die until December 10, 1896. The bill charged the killing to have taken place December 5, 1896, and prisoner moved the Court to discharge him as to this bill of indictment: (1) That an acquittal of this bill would not protect him from an indictment which could be preferred, alleging the killing to háve taken place on or after the death of the deceased; (2) that the proof shows that deceased was alive and in being after the alleged death, December 5, 1896. Motion overruled, and defendant excepted.

Bascom Roberson testified: On December 5, 1896, he and James Riddle and the prisoner left Higgins' about 12 o'clock, to go to McNeill's store. Witness had a bottle of whisky. Prisoner had three or four bottles and a pistol. They had not gone far, when they saw deceased coming, and prisoner asked who it was. Deceased was a boy, about 15 years old, and lived four or five.miles away. When he came up, they treated him and went on up the river, Riddle and prisoner walking in front, and witness and deceased behind. They had not gone far, when deceased told witness that he was going to the marriage of his brother, and wanted witness and Riddle to go with him. Witness told him to tell Riddle, and deceased took him to one side, and had a talk with him. Deceased said he did not want prisoner to go; that prisoner was under the influence of liquor. Shortly afterwards prisoner pulled out his pistol, and fired, and they tried to get him to shoot out all the loads, fearing he might shoot them by accident: prisoner stated he had but two more loads, and that he was going to kill a man, and he pulled out his pistol, and in flourishing it around broke one of the bottles he had in his own coat pocket. This made him mad, and he swore we were the cause of it. He presented his pistol at Riddle. Witness knocked the pistol out of his hand, and broke a piece off the handle. They had not gone far before prisoner presented his pistol at Riddle

and the deceased, and told them if they did not stop and drink with him he would kill them. They stopped and drank. Prisoner swore he was going to kill deceased, and presented his pistol at him. Deceased got behind Riddle. Prisoner ran after him, with pistol in hand, and deceased got behind witness, when witness told prisoner he could not hurt deceased, and to stop. He put up his pistol, and asked deceased if he was armed, and deceased said he was not. Prisoner then took hold of him, and searched him, and took his knife, and also the witness' knife, which the deceased had borrowed, and said he was going to throw them into the river, but witness prevented this. They all started on again, arranged as before, and had not gone far when prisoner pulled his pistol out, and called to them to stop, or he would shoot them; and they stopped. On starting again, witness and deceased got in front and ran down to the canoe landing on the river (which was about fifty feet wide), and hid under the bank, got in the canoe, and crossed the river, before prisoner discovered that they had crossed; they were trying to get away from him to go with the deceased to the marriage, and when prisoner saw them he drew his pistol, and ordered them to bring the boat back, and swore that if they did not he would go over there and shoot them. Witness told deceased to run. Deceased replied that he had been trying to get away from the prisoner for some time, and he would not run any further. Prisoner waited a little with pistol in hand, swearing he would kill deceased, and deceased picked up a rock. Prisoner came out of the water, ran deceased round a tree, behind which he was hiding, some two or three times, during which time deceased was begging him not to shoot, and prisoner snapped his pistol at him, after which deceased threw a rock at prisoner, but missed him, and immediately after the rock was thrown, the prisoner shot the deceased, the ball passing through his

lungs and liver. When the pistol was fired, some one said to Pate, (the prisoner), from across the river, not to shoot that boy any more, and prisoner pointed his pistol at the party across the river, and swore if he came over he would shoot him. Deceased told prisoner he had killed him, and prisoner lifted deceased's coat and looked at the wound, and said, "If I have, God have mercy on you," and ran off, and was not seen any more until he was arrested. The evidence of Thomas Edwards and James Angel is about the same as that of the preceding witness in all material respects.

Dr. Whittington, a physician, testified that he attended the deceased, and made a *post mortem* examination, and that the ball passed through the lungs and liver, and lodged in the backbone which caused his death.

The father of the deceased testified that deceased was 15 years old, and weighed 100 pounds. The mother of the prisoner testified in his behalf that he was born on May 2, 1881, and had spasms when an infant, and continued to have them until he was a good-sized boy, and then he got better; but since he had got to drinking they had come back on him. On the night of the killing he came home about dark and was drinking, and his face was bloody, and he said the deceased had killed him. He did not appear to know much. A sister of prisoner testified that shortly after the killing she went down to the river to meet her husband, and saw four boys coming up the river.. She hid under the bank near the water, and saw Bascom Roberson and deceased take a canoe, and cross the river, and prisoner and deceased got into a quarrel. Prisoner crossed the river, but before he got out of the water the deceased threw one rock at him, and missed him; and when he got to the bank another rock was thrown, which hit the prisoner on the side of the head; and a third rock was thrown, which struck the

fence. Deceased and prisoner ran around a tree,—acted as if they were trying to get rid of each other. Prisoner shoved his pistol down, and shot, and walked off a little way with Roberson, and turned, and walked back to the deceased, pulled up his coat, and looked at him, and then started off. Prisoner would take spells when he was a baby, and did not have any sense. Witness did not let herself be known at the river. A brother-in-law of prisoner testified that he saw prisoner after dark that night, and his head was cut; that he had seen him when he did not seem right; that he took him to Madison county the night after the killing. Witness admitted on cross-examination that he betrayed him to J. Hensley, the father of the deceased, for $10. The evidence of Jesse Harden was, in substance, the same as that of the other witnesses in reference to the crossing of the river, running around the tree, etc. The evidence of six other witnesses was to the effect that they knew the prisoner, and had never known or heard of his having spasms before, and that he was about 18 years old.

Prisoner asked the Court to charge: (1) If, previous to the time the quarrel arose across the river, the deceased and prisoner were friends, and at that time there was no preconceived malice on the part of the prisoner, and that the fight occurred on account of the language and the quarrel that arose at that time, the deceased being armed with a rock, and the prisoner with a pistol, the prisoner would be guilty of manslaughter. (2) That, if prisoner went across the river for the purpose of recovering his money, or he believed that Roberson and the deceased were in possession of his money, and were trying to escape with it, he had a right to cross the river with his pistol in his hand, and, if assaulted with a rock by deceased, and he fired his pistol to save himself from death or great bodily harm, he is not guilty. (3) If deceased and prisoner met at the canoe landing, and upon

a sudden quarrel a fight ensued, and the prisoner killed the deceased, even if there had been previous malice, the law will not refer to the malice, but to the provocation, and extenuate the offense to manslaughter.     *     *     *     (5) If previous quarrels and difficulties between them had been reconciled, and the fight occurred upon a fresh quarrel, it will not be presumed that prisoner was moved by the old grudge, unless it appears from all the circumstances.     (6) If prisoner entered into the fight with a deadly weapon, and in the progress of the fight the prisoner was pressed to the wall,—that is, if he was placed in such a position that he had to take the life of his adversary, or receive great bodily harm, or be killed,—and he took the life of his adversary, he would not be guilty. Prisoner excepted to the refusal to give the above instructions as prayed for, though they were, in substance, embraced in his Honor's charge to the jury.

There was a verdict of murder in the first degree. A motion for new trial was made and refused, and from judgment of death the defendant appealed.

*Mr. Zeb V. Walser, Attorney General,* for the State.
No counsel, *contra.*

MONTGOMERY, J.: The defendant was not represented in this Court by counsel and on that account we have given the whole record a most thorough and painstaking examination. The indictment contains every averment under the requirements of Chapter 58 of the Acts of 1887 to make it a complete bill of indictment for murder. Indeed, less might have been charged in the indictment and yet the same held good and sufficient under the decision of this Court in *State* v. *Arnold,* 107 N. C., 861. In the body of the indictment the name of the person accused, the defendant, is set out, as was the County of his residence, the date of the homicide, the averment "with force and arms," the

County in which the offence was alleged to have been committed and that the accused person feloniously, wilfully, and of his malice aforethought did kill and murder the person alleged to have been killed, against the form of the Statute in such case made and provided and against the peace and dignity of the State." The Court was, therefore, right in its refusal to quash the bill on the motion of the defendant.

After a portion of the testimony had been received to the effect that the deceased was shot and wounded by the defendant on the 5th of December, 1896, and that he died a few days thereafter—70 hours according to the testimony of the attending physician,—the counsel of the defendant "moved the Court to discharge him as to this bill of indictment." We will treat this motion as one made for a new trial because of variance between allegation and proof. The ground of the motion was that it was shown by the evidence that the deceased lived some days after he had been wounded, while the bill of indictment. alleged that he was killed outright on the 5th of December and that, therefore, the defendant might be indicted again for the same offence if he should be acquitted on the present trial. The answer to that is that the day on which the indictment alleged the homicide to have been committed is immaterial as to the point raised by the defendant. The State had the right to prove and it was its duty to prove the homicide, if such could have been done, on any day up to the finding of the bill; and all the evidence in the case bearing on the time of the wounding and the time of the death was that he died before the finding of the bill, and within less than a year and a day, *to-wit*, within three days from the day on which the wound was inflicted. It was held in *State* v. *Orrell*, 12 N. C., 139 (before our *Code*, Section 1189; Section 20, Chapter

121—84

35, Rev. *Code*) upon motion in arrest of judgment, that the failure in the indictment to allege that the death of the deceased occurred within a year and a day after the wound was inflicted was fatally defective. In that case the indictment charged that the mortal wound was given on a particular day, but failed to state when the death occurred. The reasoning of the Court was that they could not conclude that the actual date of the mortal wound was the day alleged in the bill, as the State could show that it was inflicted on any day before the bill was found. It might have been proved to have been given on any day previous to the finding of the bill, for such proof would have supported the charge that it was given on the day mentioned in the indictment. The Court therefore could not derive any aid from the time charged in the indictment as to when the wound was given, and, by a comparison of that time with the time of the finding of the bill, conclude that death followed within a year and a day from the date of the wound.

But even before the Statute of 1887, Chapter 58, we think the indictment in the case before the Court would have been good so far as the objections raised by the defendant are concerned. In the case of *State* v. *Baker*, 46 N. C., 267, the indictment charged that the blow was inflicted on a certain mentioned day and that the deceased *instantly* died; whereas the fact was established by the evidence that the deceased did not die on the day the wound was inflicted but lived nearly three weeks thereafter. The Court held that the variance was not material because the evidence showed that death occurred within the year and day from the infliction of the wound. The motion to discharge the defendant, treated as a motion for a new trial for variance between allegation and proof, was properly refused by the Court. Such of the special instructions prayed for by the defendant as should have been given to the jury were, in

substance, embraced in his Honor's charge; and the Court instructed the jury fully and carefully as to the law bearing upon murder in the first and second degrees under our Statute and also as to that concerning manslaughter, applied those principles to the facts developed in the trial, and gave the whole matter a fair and careful investigation.

The Judge who drafts this opinion of the Court fresh from the perusal of the record in the case, is saddened to have to write that the judgment of the Court below must be affirmed. The youth who was murdered was only fifteen years old and his slayer only about eighteen, addicted to the drink habit and drinking at the time he committed the murder. The boy criminal is by judgment of human law condemned to give his life as the penalty of his crime, but the Great Spirit alone can know how much of that sin is chargeable to him and how much to those who have influenced his life and how much to those who, wherever they live, might have used agencies to make that life one of a higher order. We find no error in the rulings of the Court below and the judgment must be affirmed.

                                              Affirmed.