STATE OF NORTH CAROLINA v. CHARLES ERNEST HOLTON, JR.

No. 53

(Filed 12 December 1973)

1. Homicide § 21— sufficiency of evidence that victim is dead

The State's evidence in a homicide case was sufficient to show that the alleged victim is actually dead, although no witness testified

that he actually saw the dead body of the victim, where several witnesses testified without objection that they had known the victim before he died, and a medical witness testified about various treatments given to the victim from the time he entered a hospital after he was shot until he died, that the victim died on a certain date, that he had seen the victim's death certificate and autopsy report, and that in his opinion the victim's death resulted from his gunshot injuries.

**2. Homicide § 12; Indictment and Warrant § 17— indictment — date of shooting and date of death — variance**

There was no fatal variance between an indictment charging that deceased was killed on 4 September 1971 and evidence that deceased was shot on that date but that he did not die until 29 December 1971.

**3. Homicide § 15; Criminal Law § 52— medical expert — cause of death — opinion based on treatment and observation**

Although an expert medical witness was unable to say that he had seen an alleged homicide victim on the date of his death, the witness was properly allowed to give his opinion as to the cause of the victim's death where it is clear that such opinion was based on his treatment and observation of the victim for some four months between the time the victim was shot and the date of his death, it not being necessary to ask the witness a hypothetical question including facts not within his personal knowledge in order for him to state such opinion.

**4. Homicide § 23— instructions — reference to "the deceased"**

The trial court in a homicide case did not err in referring to the alleged victim in the charge as "the deceased" where all the evidence indicated the victim was dead.

APPEAL by defendant from *Copeland, S.J.,* at the 9 April 1973 Criminal Session of GUILFORD Superior Court, High Point Division.

By indictment, proper in form, defendant was charged with the murder of Buford Ball. He was found guilty of murder in the first degree and appeals from a judgment imposing a sentence of life imprisonment.

The State's evidence tends to show that during the early morning hours of 4 September 1971, from approximately 1:00 a.m. to 2:30 a.m., defendant and the deceased Buford Ball were in a poolroom in the Five Points News and Record Center in High Point, North Carolina. During this time Presley Spivey and David Patton were engaged in playing a series of games of pool, and both defendant and Ball had placed wagers on Spivey's winning. There was testimony that defendant and

Ball had been drinking during the evening, and that defendant had continued to drink while the games were in progress.

While the games were being played, defendant left the room to get a coke. When he returned, Ball was in his seat. Defendant cursed Ball and told him to get out of his seat. This precipitated a series of arguments between defendant and Ball that lasted for an hour or more. During one such argument defendant pulled a knife from his pocket and put it to Ball's throat, saying "I am going to cut your G— d— head off." The proprietor of the poolroom intervened and threatened to end the game if defendant and Ball did not quit scuffling. Sometime later another argument began. Ball said something about defendant's having cut him or tried to cut him with a knife, and then Ball hit defendant in the mouth, breaking defendant's partial dental plate and several teeth and causing his mouth to bleed. Two people in the poolroom stepped in and broke up the fight, and the proprietor told everyone to get out.

Defendant walked out of the poolroom, went to his car trunk and got a pistol, returned, and shot Ball three times. Ball ran outside onto the street holding his stomach, and then collapsed. Defendant walked up to him and said, "Buford, you are going to apologize to me or I am going to kill you." Spivey persuaded defendant not to shoot Ball any more, and defendant then turned around and walked away. Spivey drove Ball to the High Point Memorial Hospital.

Shortly after shooting Ball, defendant and his wife drove to the High Point Police Department. There Detective L. P. Royal advised defendant of his constitutional rights and defendant signed a waiver of rights form that was introduced at trial. Defendant described the events leading up to Ball's hitting defendant in the mouth and breaking his dental plate. Defendant told Royal that he was very upset about his dental plate being broken, and that he went to his car and got his pistol, cursed Ball a few times, and then shot him. Royal asked defendant if he knew there was a good chance that Ball might die. Defendant replied: "I hope he doesn't die; I want to have the chance one time to knock his teeth out." Royal testified that although he detected the smell of alcohol on defendant's breath, defendant coherently responded to all questions asked him. Defendant was placed under arrest for an assault with a deadly weapon with the intent to kill and inflicting serious injuries.

The testimony of Dr. Donald P. Douglas, the physician who examined and treated Ball at the High Point Memorial Hospital, and the facts surrounding Ball's death on 29 December 1971 are fully set out in the opinion.

Defendant did not testify or offer evidence.

*Attorney General Robert Morgan and Assistant Attorneys General Claude W. Harris and Walter E. Ricks III, for the State.*

*Schoch, Schoch, Schoch and Schoch by Arch K. Schoch for defendant appellant.*

MOORE, Justice.

[1]    Defendant by his first assignment of error contends that the trial court erred in overruling his motion for a directed verdict of not guilty for the reason that the State failed to prove that Buford Ball, the alleged deceased, is actually dead. This contention is based upon the fact that no witness testified that he actually saw the dead body of Ball.

In a criminal case the proper motion to test the sufficiency of the State's evidence is a motion to dismiss the action or a motion for judgment as in the case of nonsuit. G.S. 15-173. *State v. Everette,* 284 N.C. 81, 199 S.E. 2d 462 (1973); *State v. Evans* and *State v. Britton* and *State v. Hairston,* 279 N.C. 447, 183 S.E. 2d 540 (1971). On such motion the evidence must be considered in the light most favorable to the State, and the State is entitled to every inference of fact that may be reasonably deduced from the evidence. Contradictions and discrepancies in the State's evidence are for the jury to resolve and do not warrant the granting of the motion. *State v. Henderson,* 276 N.C. 430, 173 S.E. 2d 291 (1970); *State v. Carter,* 265 N.C. 626, 144 S.E. 2d 826 (1965). Admitted evidence, whether competent or incompetent, must be considered on defendant's motion for judgment as in the case of nonsuit. *State v. Accor* and *State v. Moore,* 277 N.C. 65, 175 S.E. 2d 583 (1970); *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679 (1967); *State v. Virgil,* 263 N.C. 73, 138 S.E. 2d 777 (1964). Treating defendant's motion for a directed verdict of not guilty as a motion for judgment as of nonsuit under G.S. 15-173 and applying the well-established rules for such motion to the evidence in this case, we hold that there was ample evidence of Ball's death to require submission

to the jury. *State v. Cutler, supra; State v. Virgil, supra; State v. Thompson,* 256 N.C. 593, 124 S.E. 2d 728 (1962).

Several witnesses for the State testified without objection that they had known Ball before he died. Dr. Douglas, who treated the deceased over a period of months, testified about various treatments given to Ball from the time he entered the hospital until he died. Dr. Douglas further testified that Ball died on 29 December 1971, and that he had seen Ball's death certificate and the report on an autopsy performed on Ball. He further testified that in his opinion "Buford Ball died as a result of infection, debilitation directly as a result of gunshot injuries, including an injury to his large bowel with gross contamination at the time of his injuries." From this evidence, it is obvious that Ball is dead. This assignment has no merit.

[2] Defendant next contends that he was entitled to judgment as of nonsuit because of a fatal variance in the bill of indictment that charged that Ball was killed on 4 September 1971 and the evidence that showed that Ball was alive some four months later. While it is true that a fatal variance between the indictment and proof may be raised by a motion for nonsuit, *State v. Bell,* 270 N.C. 25, 153 S.E. 2d 741 (1967) ; *State v. Law,* 227 N.C. 103, 40 S.E. 2d 699 (1946), no such variance appears in this case. G.S. 15-155 provides that neither "omitting to state the time at which the offense was committed in any case where time is not of the essence of the offense, nor for stating the time imperfectly" shall vitiate an indictment. The indictment in this case stated the date on which the fatal injury was inflicted rather than the date on which the death occurred. This Court, as early as 1854 in *State v. Baker,* 46 N.C. 267, held that where an indictment charged the murder as of the date the blow was given, and the evidence revealed that the victim lived for twenty days after receiving the blow and then died, such variance was not material. See also *State v. Davis,* 282 N.C. 107, 191 S.E. 2d 664 (1972) ; *State v. Trippe,* 222 N.C. 600, 24 S.E. 2d 340 (1943) ; *State v. Pate,* 121 N.C. 659, 28 S.E. 354 (1897).

[3] In his next assignment defendant asserts that the trial court erred in permitting the expert witness, Dr. Donald P. Douglas, to give his opinion about the cause of Ball's death without propounding a hypothetical question to include facts of which the doctor had no personal knowledge.

Dr. Douglas testified that he and his associate, Dr. Canipe, treated Ball from the time he entered the hospital on 4 Septem-

ber 1971 until the date of his death on 29 December 1971. Dr. Douglas first saw Ball in the emergency room of the High Point Memorial Hospital, and at that time Ball's condition was "quite serious." Ball was suffering from a gunshot wound in his right shoulder and three such wounds in his abdominal cavity. One bullet had passed through the large and small intestines, causing contamination and extensive damage, and then lodged in the left pelvic. During the first operation on the intestines Ball lost almost all of his body's blood. Dr. Douglas did not feel that Ball could survive any more surgery, and consequently he elected to temporarily leave the bullet in the pelvic. The contamination that resulted from bowel movement having been spilled throughout the abdominal cavity soon caused infection in the pelvic area and necessitated a subsequent operation by an orthopedic surgeon, Dr. Fred Wood, to remove the bullet and drain the infection. This operation was performed on 1 October 1971. On 2 November 1971 Ball suffered massive hemorrhage along a rubber tube that had been inserted in his abdominal cavity to drain the infected material that resulted from the initial contamination of the gunshot injury. Again surgery was required.

Dr. Douglas testified without objection: "In my opinion, the pus resulted from the initial contamination of the gunshot injury with the continued infection and drainage from this site from that point until the time of the patient's death. . . . I followed the patient from the time of his admittance until he died, well, Dr. Canipe and I did. I am not sure on the last days before his death whether Dr. Canipe or I took care of him." Dr. Douglas was then allowed to state over objection that in his opinion "Buford Ball died as a result of infection, debilitation directly as a result of gunshot injuries, including an injury to his large bowel with gross contamination at the time of his injuries." He further testified without objection: "I have found nothing in [the hospital] records to indicate that I gave him any treatment or saw him after December 25, 1971. I could have. . . . The nurses do not always note in their notes when the doctor comes to see a patient. They have a notation on December 25 that I was there. . . . I can say that Buford from the time of his hip surgery had a very slow but progressive downhill course, a very slow progressive downhill course."

Defendant contends that since Dr. Douglas cannot say that he saw Ball immediately before or after his death, Dr. Douglas is not qualified to give an opinion about the cause of his death

without a hypothetical question supplying facts which the doctor did not know of his own knowledge. We think, however, it is obvious from this record that, based on his knowledge and experience and his treatment and observation of the deceased Ball for approximately four months, Dr. Douglas was entitled to give an opinion on the cause of death based upon such facts within his personal knowledge. "It is not required that an expert testify in response to hypothetical questions when the witness has himself examined the person in question and is giving his expert opinion based on facts which he himself had observed." 3 Strong, N. C. Index 2d, Evidence § 49 (1967). See *Cogdill v. Highway Comm.* and *Westfeldt v. Highway Comm.*, 279 N.C. 313, 182 S.E. 2d 373 (1971); *Rubber Co. v. Tire Co.*, 270 N.C. 50, 153 S.E. 2d 737 (1967); *Bullin v. Moore,* 256 N.C. 82, 122 S.E. 2d 765 (1961). It is well settled in the law of evidence that a physician or surgeon may express his opinion on the cause of the physical condition of a person if based either on facts within the personal knowledge or upon an assumed statement of facts supported by evidence and cited in a hypothetical question. 1 Stansbury's N. C. Evidence, Brandis Rev. § 136 (1973); *Yates v. Chair Co.*, 211 N.C. 200, 189 S.E. 500 (1937); *State v. Stewart,* 156 N.C. 636, 72 S.E. 193 (1911). Although the evidence does not disclose that Dr. Douglas actually saw the deceased on the date of his death, his testimony shows that he and his associate, Dr. Canipe, treated Ball for a period of almost four months; that after his hip operation Ball's condition became progressively worse; and that Dr. Douglas continued to treat and observe him at least through 25 December 1971. It is clear then that his testimony on the cause of death was based on his observation, treatment, and knowledge of the deceased's condition and upon facts that he himself had observed. No hypothetical question was therefore necessary, and the doctor's testimony was competent.

[4] Defendant's final contention is that the court erred in its charge to the jury by referring to Buford Ball as "the deceased." All the evidence indicates that Ball was dead. Defendant's counsel even questioned a witness about Ball's death certificate and the autopsy performed on Ball. This assignment is without merit.

In the trial, verdict, and judgment we find no error.

No error.