STATE OF NORTH CAROLINA v. ROGER DALE CURRY, JOSEPH MICHAEL GUNTER, ALBERT WILLIAM JOHNSON, RONALD ALLEN JOHNSON, LOWELL GENE BOWLES, JAMES OLIVER STEVENS

No. 37

(Filed 17 December 1975)

1. **Burglary and Unlawful Breakings § 5; Robbery § 4— first degree burglary — robbery with firearm — sufficiency of evidence**

Defendants' motions to dismiss the charges of first degree burglary and robbery with a firearm were properly denied where the evidence tended to show that the victim was awakened during the night by the growling of his dog, he observed a man shining a flashlight into his window, the man entered the house and told the victim to call his dog and come outside to talk, the victim refused and armed himself with a pistol, the intruder left the house, the victim observed eight armed men standing in his yard, three entered the house and began firing at the victim who returned their fire, the three men left and fired into the house from outside, one of the men told the victim to throw his gun down or they would burn the house, the victim complied, the eight men beat him, and the eight then went through the victim's house emptying drawers and boxes, smashing furniture, and taking various items belonging to the victim, and the victim identified the six defendants as participants in the crime.

2. **Searches and Seizures § 1— search of shed cellar — standing of defendants to object**

Defendants had no standing to object to the admission into evidence of weapons and articles found in the cellar of a shed in the vicinity of the crime, since the shed was not occupied by anyone at the time of the discovery and seizure of the articles and was not on or a part of the premises occupied by defendants, none of the defendants was then in or about the shed, and no defendant asserted any ownership or possessory interest therein; furthermore, a photograph of the articles seized and the articles themselves were admissible in evidence since they were seized during a lawful, though warrantless, search of the shed by officers who had probable cause to believe that two of the defendants were probably concealed in the vicinity.

**3. Criminal Law § 84; Searches and Seizures § 1— weapons in plain view — seizure without warrant — admissibility**

Where defendants failed to object at the time they were offered into evidence to the admission of weapons removed by officers from one defendant's house, they cannot assert on appeal that the weapons were the fruit of unreasonable search and seizure; moreover, evidence tended to show that the officers were lawfully in the house, having reason to believe that two other defendants for whom the officers had arrest warrants might be therein, and the evidence tended to show that the weapons seized were in plain view in the house.

**4. Burglary and Unlawful Breakings § 4; Robbery § 3— victim's description of assailants — competency**

The trial court in a prosecution for first degree burglary and robbery with a firearm did not err in allowing the victim, over objection, to describe the appearance of and clothing worn by his assailants or in admitting into evidence a shirt and jacket worn by one defendant when he was arrested.

**5. Criminal Law § 86— cross-examination of defendant — prior convictions or acts of misconduct**

A defendant in a criminal case who takes the witness stand may not be asked on cross-examination as to whether he has been accused, indicted or arrested for an unrelated criminal offense, but he may be asked whether he has been convicted of or has committed such criminal acts or other specific acts of reprehensible conduct, provided the question is asked in good faith; therefore, it was not error for the trial court to permit the State to cross-examine defendants charged with first degree burglary and robbery with a firearm with reference to other acts of misconduct.

**6. Criminal Law § 77— defendant held at gun point — statement competent as admission**

In a prosecution for first degree burglary and robbery with a firearm where the evidence tended to show that the victim's stepfather, not a police officer, held one defendant at gun point while the victim went to call police and the stepfather asked defendant who had been with him, defendant's response, "I'll take you to the rest of them if you will let me go," was competent as an admission against that defendant.

**7. Criminal Law § 58— handwriting expert — refusal to give opinion — other testimony admissible**

Although an expert handwriting witness was unable to form an opinion satisfactory to himself as to whether one defendant had or had not signed the document in question because it was the witness's opinion that the photostatic copy of the document offered him did not show clearly certain characteristics of the handwriting, it was not error for the court to allow the witness to point out certain observable differences between the photostatic copy of the document and a known sample of the defendant's handwriting.

8. **Criminal Law § 66— improper lineup procedure — in-court identification not tainted**

   In a prosecution for first degree burglary and robbery with a firearm, the trial court did not err in allowing the victim's in-court identification of each defendant, though the victim had previously identified four of the defendants in an improper lineup procedure, since the trial court determined that the victim's in-court identification of defendants was based solely on what he observed at the time of the crime and was not the result of any out-of-court confrontation.

9. **Criminal Law § 169— exclusion of witness's answers — failure to include answers in record — no error shown**

   Defendant failed to show error in the exclusion of answers by a witness to questions where the record fails to show what the witness would have answered.

APPEAL by defendants from *Thornburg, J.,* at the 3 February 1975 Session of MECKLENBURG.

Under separate indictments, each proper in form, the six defendants were tried together and each was convicted of burglary in the first degree and of robbery with a firearm. On the burglary charge each was sentenced to imprisonment for life and on the robbery charge to imprisonment for 30 years, the sentences to run concurrently. All assignments of error relate to rulings of the trial court admitting evidence offered by the State, overruling of objections to cross-examination of the defendants and to the denial of motions for dismissal.

The evidence for the State, if true, is sufficient to show the following:

On 30 March 1974, Michael Francis moved into a house on Heavy Equipment School Road in Mecklenburg County. The defendants Gunter and Ronald Johnson lived in two other houses in the vicinity. On the night of 3-4 April 1974, Francis was alone with his dog in his house. He was awakened shortly after midnight by the growling of his dog. He observed a man outside the house shining a flashlight into it through a window. This man pushed the door open and entered the house, shining the light about. He told Francis to call his dog and to come outside to talk. Francis refused to do so and armed himself with a pistol. The intruder, identified in court by Francis as the defendant Curry, then left the house. In the yard there was a light similar to a street light. As Francis was dressing, the dog growled again, so Francis went to the window carrying a pistol and a rifle. He observed eight armed men standing in

State v. Curry

his yard. Three of them approached the door. As they did so he could see their faces. They were the defendants Curry, Stevens and Bowles. They kicked the door open and entered the house. All three were armed with pistols and began firing at Francis, who returned the fire with his rifle. One of the three, believed by Francis to be Stevens, said he was shot, and the three men left the house. Thereafter, they fired into the house from outside it. The exchange of gunfire continued fifteen to twenty minutes. By the light from the yard lamp, Francis recognized Gunter, with whom he had had some discussion on the day he moved into the house. Gunter was armed and called to Francis, telling him to throw his gun down or they would burn the house. Francis, running low on ammunition, threw his gun down, turned on his light as directed and stood in the doorway with his hands raised.

Pursuant to direction from the armed group, Francis went out into the yard. Gunter hit him in the head with a pistol and Curry began taking things from Francis' pockets. Francis was then dragged back into the house, which was then well lighted, and badly beaten.

In the courtroom, Francis identified all six of the defendants as members of the attacking group. The other two men were not apprehended. Each of the six was armed with a pistol, rifle or machine gun. All participated in the beating of Francis. The group pulled the drawers from Francis' desk, emptying the contents and searching through these. Ronald Johnson broke open a locked box and took therefrom eight track tapes. Gunter removed Francis' wristwatch, knife, belt and holster. Others of the defendants smashed various articles of furniture and removed from Francis' pocket his wallet, car keys, pocket knife and change.

Finally, Francis broke away and ran out of the house and into the woods. Reaching a telephone, he called his stepfather who came to his assistance. They returned to the house, from which the intruders had departed, and found it generally ransacked and Francis' boots, guns, radio and stereo missing. Numerous bullet holes were in the furniture and door and window.

Francis' stepfather, hearing a noise outside, went out and observed the defendant Curry looking in the kitchen window. He held Curry at gun point. Francis came out and identified

Curry as one of the attacking group. Francis went to a telephone and summoned the police. After his return Curry broke away and ran to and dived into a nearby pond. He was recaptured by Francis and his stepfather and held until the arrival of the police officers, who took him into custody, searched him and found on him tools belonging to Francis.

At the time of the entry of the eight men into Francis' house, the defendant Stevens was wearing a cut off blue jean jacket on the back of which was printed the word "Outlaw." Curry, when captured, was wearing a black T-shirt on the back of which was the word "Outlaw" and on the front of which was a patch bearing the words "One Percenter." The remaining men in the attacking group were wearing blue jeans and T-shirts. All of the defendants wore long hair and beards or mustaches.

Arriving at the Law Enforcement Center, after first going to the hospital emergency room for treatment of his injuries, Francis described his attackers to the officers, who handed him photographs of ten known members of a motorcycle club in the Charlotte area known as the "Outlaws." All the photographs were of young white males with long hair and beards. From the photographs Francis identified the defendants Gunter, Bowles, Ronald Johnson and Stevens as among his eight attackers. Later in the day, he picked Albert Johnson from a lineup as another of the attacking group.

The next morning a group of police officers, having warrants for the arrest of Gunter, Stevens and Bowles, went to the Gunter and Johnson residences to arrest them. Gunter came out of one of the houses carrying a revolver. At the direction of the officers he dropped it and was arrested. The officers instructed him to call out of the houses anyone still therein. He called out the names "Glueball" and "Abby." The two defendants Johnson came out, one from each house. They were also placed under arrest for investigation for these offenses and the three were taken to the police station. Stevens and Bowles were not found by the officers at that time and were arrested at substantially later dates.

After the arrest of Gunter and the two Johnsons, officers went into the Johnson house in an effort to locate and arrest, pursuant to the warrants, the defendants Stevens and Bowles, having information that these defendants had been staying there. They did not find them. As they walked through the

house, they observed in plain view, and took into their possession, a loaded shotgun, a pistol, a .22 caliber rifle, a machine gun and substantial quantities of ammunition. These weapons were introduced in evidence. When they took possession of them, the officers did not know whether other persons, including Stevens and Bowles, were in the house.

Nearby was a shed building, not part of the Gunter or Johnson premises. It was unoccupied and the record does not indicate who was its owner. Two of the officers went to it to search for Stevens and Bowles. They crawled through a window and searched the structure but found no one. They removed a piece of aluminum siding from a cellar door and entered the cellar, still looking for Bowles and Stevens. They found no one, but observed, in plain view, a pair of boots and other articles identified by Francis as having been removed from his house by the attacking group. These were introduced in evidence. Francis had observed Gunter pick up the boots in his house.

On 26 October 1974, Francis, having previously identified the picture of the defendant Stevens as that of one of the attacking group, viewed a lineup of five persons from which he picked Stevens as one of the attacking group.

Three .22 caliber cartridge casings found by the officers in the yard of the Francis house were, in the opinion of the State's expert witness on ballistics, fired from the .22 caliber rifle found by the officers in the Johnson house.

The defendant Stevens, though not testifying himself, offered evidence which, if true, showed that he was in the State of Colorado at the time of the alleged offenses, that he was then using the name Gerald Murphy, and in that name, on the date of the alleged offenses, applied in Colorado for a transfer of an automobile title from a South Carolina registration to a Colorado registration. There is no scar on Stevens' body such as would have been there had he been shot on 4 April 1974, as Francis testified.

The woman, with whom the defendant Gunter was living on the date of the alleged offenses, testified that during the entire night of April 3-4 Gunter was with her in their house and, while they were watching television, they heard a number of gunshots. After the gunfire stopped, Gunter went to see what was happening. While the gunfire was in progress, Albert Johnson, who was staying with Ronald Johnson, came

to the Gunter house and commented on the gunfire. Gunter, himself, also testified that he was watching the television when the gunfire was heard, that Albert Johnson then came in and after the gunfire ceased the two of them went to investigate. He denied seeing Francis at any time that night and testified that none of the things alleged to have been taken from the Francis house was ever in Gunter's house at any time. The shed in which some of these articles were found by the searching officers is not on Gunter's property. Gunter denied that he had ever entered Francis' house, removed anything therefrom or struck Francis. When he went to investigate the shooting, he saw the defendant Bowles coming toward him. Bowles "had nothing" and they had no conversation.

The defendant Ronald Johnson testified that at the time of the shooting he was at his home working on a motorcycle. With him during the evening were his wife, Bowles and two other men who had come with Curry. When he heard the gunshots, he went out into his yard. At that time his shotgun was in a closet in his house. He never picked it up or left his premises or fired a gun that night. Albert Johnson, Bowles, Curry and Curry's two friends were in and out of the house during the evening. When the officers came to the Johnson house the next morning, the shotgun was in the closet, not on the window ledge where the officers testified they saw it. The .22 caliber rifle was not in the house at all. Johnson gave no officer or any other person permission to search his house or remove any gun or other object therefrom. The shed from which the searching officers removed articles is not on the Johnson property and Johnson put nothing therein. He did not see Stevens on the night in question.

The defendant Bowles testified that on the night of April 3-4, 1974, he was visiting at the home of Ronald Johnson. Also present there during the evening were Ronald Johnson's wife, Albert Johnson, Curry and two friends of Curry's whom Bowles had never seen before. Bowles left the Johnson house, after the gunfire stopped, to see what was happening. When he got to the Francis house, Francis, Curry and Curry's two friends were in the front yard and a scuffle was in progress. One of Curry's friends cried out that he had been shot. This man was beating Francis with a gun and Curry was trying to pull him away from Francis. Bowles attempted to take the gun and was, himself, struck in the head with it. At that time Francis ran away. Bowles

State v. Curry

never went into the Francis house. On the way back to the Ronald Johnson house, he met Albert Johnson who asked what had happened. He also met Gunter. After this occurrence was concluded, Bowles left the vicinity and went to his parents' home, stayed there a day and then returned to his own home in Atlanta. When Bowles left the Francis premises the two friends of Curry's were still in the yard and Bowles never saw them again. He took no gun down to the Francis house and did not observe any gun in the Ronald Johnson house.

The defendant Curry testified:

On the evening of 3 April 1974, he was visting Ronald Johnson and Gunter, being accompanied by two acquaintances from Michigan. In the early evening the three of them had a conversation with Francis, as a result of which one of Curry's friends gave Francis a $100 bill for which Francis agreed to procure marijuana which he would deliver to Curry's friend at his house at 11 p.m. Curry and his two friends went to Francis' house at the appointed time to get the marijuana. Curry had no weapon and no flashlight and did not look through a window into Francis' house.

Curry knocked on the door and Francis came to the door with his German police dog on a chain and with a pistol, which he pointed at Curry. Curry asked Francis to come outside as Curry's two friends wanted to see him. Francis refused to do so and said he did not have the marijuana and they should come back the next day. Curry then went back to his two friends in the yard and reported to them what Francis had said. No one else was present. Curry and his two friends then approached the door of the Francis house. As they did so, a gun was fired through the doorway. One of Curry's Michigan friends cried out that he had been shot. The two Michigan men then ran back to their car, got their guns and returned the fire. Approximately a dozen shots were fired altogether.

Curry had no weapon and did not kick open the door to the Francis house. This was done by one of the men from Michigan. Francis gave up and came to the door. Curry's Michigan friend then seized Francis and dragged him into the yard, hit him with a rifle and knocked him down. Both of the men from Michigan then began to beat Francis. Curry grabbed one of them and tried to get him to stop. Bowles came up and tried to help Curry stop the fight, being, himself, hit by the rifle. Gunter was not present.

The Michigan man took Francis' wallet and searched it for the $100 bill he had given Francis. During the scuffle Francis got up and ran away. The two Michigan men then went into the house to look for the marijuana or the $100 bill. Curry left and went back to the Ronald Johnson house.

When the two Michigan friends did not follow him, Curry went back to the Francis house to find them and at that time was taken prisoner by the stepfather of Francis who held a gun on him. Francis then came up, said that Curry was one of the men who had attacked him and tried to cut Curry with a knife, so Curry ran. While running, he was shot at but not hit and he fell into the pond, swam out to the middle of it and was kept in the pond at gunpoint by Francis and his stepfather until the police officers arrived.

At no time did Curry go into the Francis house or take anything from Francis' pocket. Tools found in Curry's pocket by the arresting officers belong to Curry. He did not at any time see Stevens and never saw Ronald Johnson near the Francis house. He never struck Francis with anything. He has not seen his friends from Michigan since that night.

*Attorney General Rufus L. Edmisten by Associate Attorney Robert W. Kaylor for the State.*

*Eubanks, Villegas & Reavis by Larry L. Eubanks and Samuel J. Villegas for defendant Curry.*

*Michael G. Plumides for defendants Gunter, R. Johnson, A. Johnson and Bowles.*

*James E. Walker for defendant Bowles.*

*Jerry W. Whitley for defendant Stevens.*

LAKE, Justice.

[1]   There was obviously no error in the denial of the defendants' motions to dismiss the charges of first degree burglary and robbery with a firearm. It is elementary that in the consideration of such a motion the court must treat the evidence favorable to the State as true, view it in the light most favorable to the State and give the State the benefit of every inference in its favor reasonably to he drawn therefrom. *State v. Holton*, 284 N.C. 391, 200 S.E. 2d 612; *State v. Rankin*, 284 N.C. 219, 200 S.E. 2d 182; *State v. Everette*, 284 N.C. 81, 199

S.E. 2d 462. Evidence of the defendants relating to matters of defense, or in conflict with the evidence of the State, is not considered upon such a motion. *State v. Carthens,* 284 N.C. 111, 199 S.E. 2d 456; *State v. Everette, supra; State v. Arnold,* 284 N.C. 41, 199 S.E. 2d 423; *State v. Peele,* 281 N.C. 253, 188 S.E. 2d 326. The court does, however, take into consideration all of the admitted evidence favorable to the State, whether such evidence be competent or incompetent. *State v. Holton, supra; State v. Accor* and *State v. Moore,* 277 N.C. 65, 175 S.E. 2d 583; *State v. Virgil,* 263 N.C. 73, 138 S.E. 2d 777. Contradictions and discrepancies, even in the State's evidence, do not warrant the allowance of a motion to dismiss, these being for the jury to resolve. *State v. Holton, supra; State v. Everette, supra; State v. Murphy,* 280 N.C. 1, 184 S.E. 2d 845; *State v. Allred,* 279 N.C. 398, 183 S.E. 2d 553.

If, so considered, the evidence is sufficient to support a finding of every element of the crime charged (or of any lesser included offense if the motion is directed to the entire bill of indictment) and that the defendant was the perpetrator, or one of the perpetrators, of the offense, the motion to dismiss should be denied. *State v. Hoffman,* 281 N.C. 727, 190 S.E. 2d 842; *State v. Allred, supra; State v. Bruton,* 264 N.C. 488, 142 S.E. 2d 169; *State v. Virgil, supra.* When the evidence, so considered, is sufficient to support a finding that two or more persons acted together, aiding and abetting each other, to commit the offense charged and that such offense was actually committed by one or more persons in such group, all being present, the evidence is sufficient to support a verdict of guilty as to all members of the group and the motion to dismiss is properly denied as to each such defendant. *State v. Rankin, supra; State v. Peele, supra; State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572, vacated as to death sentence only, 408 U.S. 939, 92 S.Ct. 2873, 33 L.Ed. 2d 761; *State v. Bruton, supra; State v. Taft,* 256 N.C. 441, 124 S.E. 2d 169.

So considered, the evidence of the State in the present case is ample to support a finding of each element of the offense of burglary in the first degree, each element of the offense of robbery with a firearm and the presence and participation in each such offense of each of the six defendants. Consequently, the motions to dismiss were properly denied.

[2] There is no error in the admission in evidence of the weapons taken by the officers from the Ronald Johnson house

or in the admission in evidence of the articles taken by the officers from the cellar of the shed. In each instance the contention of the defendants is that these articles were the products of an illegal search and seizure and, therefore, could not properly be admitted in evidence.

As to the articles taken from the cellar of the shed, it is sufficient to note that none of the defendants has standing to raise the question of unlawful search and seizure. The shed, a building apparently not occupied by anyone at the time of the discovery and seizure of the articles, was not on or a part of the premises occupied by Gunter or Ronald Johnson; none of the defendants was then in or about the shed; and no defendant asserted any ownership or possessory interest therein. Possession of the articles seized at the time of the search and seizure is not an essential element of either of the offenses with which they are charged. *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed. 2d 208.

Ronald Johnson testified: "The shed is not on my property. I know nothing about the shed. I do not have any of my belongings down there or put any of my belongings in there or anything like it." Gunter testified: "The shed is really like a house. A man tried to rent it. It's got its own yard. It is not on my property. It has its own yard lines. There is [sic] a lot of big bushes and stuff and a lot of ground separating the shed from the Johnson property. The distance between my house and the shed is 100 to 130 feet. There are woods between my house and the shed. The woods are fairly dense." As Chief Justice Parker, speaking for the Court, said in *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25: "The immunity to unreasonable searches and seizures is a privilege personal to those whose rights thereunder have been infringed. They alone may invoke it against illegal searches and seizures." In *State v. Eppley,* 282 N.C. 249, 192 S.E. 2d 441, we said: "Neither the Constitution of the United States nor the law of this State confers upon a mere intruder into the house of another the right of the owner to object to a search of it and so enable him to take possession of and use the house of another as a sanctuary within which to secrete stolen property. Such intruder has no right to privacy within such house. Consequently, he has no standing to object to the introduction of the fruits of a search of the house into evidence in his prosecution for the larceny thereof." See also: *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed. 2d 697; *State v. Gordon,* 287

N.C. 118, 213 S.E. 2d 708; *State v. Harrison,* 239 N.C. 659, 80 S.E. 2d 481; Strong, N. C. Index 2d, Criminal Law, § 84; Annot., 78 A.L.R. 2d 246; Annot., 4 L.Ed. 2d 1999, 2012.

Furthermore, when the defendants objected to testimony designed to authenticate a photograph of the articles so found in the cellar of the shed, the court properly conducted a voir dire. At its conclusion the court found the following facts which findings (here summarized) are supported by evidence introduced upon the voir dire or theretofore received in the presence of the jury:

> The officers went to the vicinity of the Gunter house carrying warrants for the arrest of Gunter, Stevens and Bowles upon the charges of first degree burglary and robbery with a firearm. Upon their arrival Gunter came from the house armed with a pistol, which he dropped upon orders from the officers. Two other persons, later charged with the same crimes, in response to calls from Gunter at the request of the officers, emerged from the Gunter house and another house nearby (the Johnson house). Under the circumstances, the officers had probable cause to believe that the defendant Bowles and Stevens had probably concealed themselves in the vicinity. The officer who discovered the articles in the cellar of the shed was at a place where he had a right and a duty to be. The articles in question were in his plain view while he was properly searching for Bowles and Stevens.

Upon these findings the court concluded that the photograph of the articles and the articles themselves were admissible in evidence. The findings of fact, being supported by the evidence in the record, are conclusive on appeal. *State v. Harris,* 279 N.C. 307, 182 S.E. 2d 364; *State v. Pike,* 273 N.C. 102, 159 S.E. 2d 334; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1. As Justice Sharp, now Chief Justice, speaking for the Court, said in *State v. Howard,* 274 N.C. 186, 162 S.E. 2d 495: "Neither the Fourth Amendment nor G.S. 15-27 is applicable where no search is made. The law does not prohibit a seizure without a [search] warrant by an officer in the discharge of his official duties where the article seized is in plain view." Accord: *State v. Harvey,* 281 N.C. 1, 187 S.E. 2d 706; *State v. Virgil,* 276 N.C. 217, 172 S.E. 2d 28.

[3] As to the weapons removed by the officers from the Ronald Johnson house, it is sufficient to note that the objection on the

ground of unreasonable search and seizure was not made in due time. During the testimony of Francis, concerning the breaking and entering of his house by the defendants and their beating of him, he was shown these weapons, marked for identification as the State's Exhibits 2, 11, 12 and 13, and he identified each as having been used by one of the defendants in beating him. They were then offered in evidence by the State and admitted over the defendants' objections. The prosecuting attorney then requested permission "to show the jury the weapons, State's Exhibits #2, #3, #11, #12 and #13." The defendants' objections thereto were overruled. When asked by the court as to the basis of objection to Francis' being asked, "Where have you seen that before?" the defendants' counsel stated: "I don't know how he can tie any of these weapons in. I've objected all along about their being the ones, unless he got them after the incident." Another of defendants' counsel said: "Your Honor, would the court see fit before introducing any of these weapons into evidence letting us cross examine him about he knows [sic] they are the same weapons, if he does know, and that sort of thing." Until long after these weapons were so admitted in evidence, there was no suggestion whatever to the trial court that the defendants, or any of them, contended the weapons were fruit of an unlawful search and seizure.

In *State v. Crews*, 286 N.C. 41, 44, 209 S.E. 2d 462, we said, "When the defendant objects to the admissibility of the State's evidence *on the ground that it was obtained by unlawful search,* it is the duty of the trial court, in the absence of the jury, to hear the evidence of the State and of the defendant regarding the lawfulness of the search and seizure and to make findings thereon." (Emphasis added.) To the same effect see: *State v. Eppley, supra; State v. White*, 274 N.C. 220, 229, 162 S.E. 2d 473.

Nothing in the record indicates that, at the time these weapons were offered in evidence by the State, the defendants were unaware of when, where and how they came into the possession of the officers. Having failed then to object on the ground of unreasonable search and seizure, they may not now be heard to assert that as a ground for a new trial.

Furthermore, the record shows that, prior to any other testimony concerning these weapons, evidence was offered before the jury, without objection, to the effect that a large num-

ber of officers, wearing flak jackets to protect them from small arms fire, and carrying warrants for the arrest of Gunter, Stevens and Bowles for the alleged burglary and armed robbery, went to the vicinity of the Gunter and Johnson houses for the purposes of serving the warrants and arresting these defendants. Upon their arrival near the Gunter house, Gunter came out of the house armed with a pistol in response to the barking of dogs. Upon the instruction of the officers, then hidden in the bushes, Gunter dropped his loaded revolver and was arrested pursuant to the warrants against him. The officers instructed Gunter to call out to anyone still in the house. He did so and the two Johnsons (later identified by Francis as two of his assailants) came out and were taken in custody for investigation of the same offenses. Curry was already in custody. Officers went to and looked into the shed in search of Bowles and Stevens, with the above mentioned results.

After the arrest of Gunter and the two Johnsons, and apparently after the search of the shed, officers went into the Ronald Johnson house looking for Stevens and Bowles in order to arrest them pursuant to the warrants. Immediately upon entering the house the officers observed, in plain view, propped against a window which commanded the driveway approaching the house, a loaded pump shotgun (State's Exhibit 13) and, on a couch, a .22 caliber rifle (State's Exhibit 12) and a machine gun (State's Exhibit 2) and ammunition for these weapons. They also observed the butt of a pistol (State's Exhibit 11) projecting from a boot. They took the weapons into their possession not knowing whether Bowles or Stevens or some other person was in the house. To this evidence there was no objection.

Then, over objection, the officer who so took the weapons into his possession in the Ronald Johnson house was permitted to testify as to what he did with them. The defendants then moved to "disallow the evidence of these guns into evidence." This motion was denied. Subsequently, a ballistics expert, a witness for the State, was permitted, over objection, to testify concerning his opinion as to whether cartridge cases found in the Francis yard had been fired from these weapons, his testimony being that, in his opinion, three of them were fired from the .22 caliber rifle.

The facts with reference to the obtaining of these weapons were developed in the presence of the jury prior to any objec-

tion which could conceivably be supposed to relate to the method by which the weapons were obtained by the officers. Therefore, there was no occasion for the court to conduct a voir dire when the objections were interposed to the testimony of the officer as to what he did with the weapons and to the testimony of the ballistics expert. Upon the voir dire previously held with reference to the admissibility of the articles found in the cellar of the shed, the court had made the above mentioned findings of fact concerning the presence of the officers in the vicinity, their possession of the warrants and their purpose to serve them. Obviously, these findings were equally relevant to the entry into the Ronald Johnson house and the discovery there of the weapons.

Long after the weapons were admitted in evidence and exhibited to the jury and after the ballistics expert had testified concerning his opinion that the cartridge cases in evidence had been fired from the .22 caliber rifle, Ronald Johnson, a witness in his own behalf, testified before the jury on cross-examination that on the morning of April 5, when the police came to his house, the shotgun was in a closet and was not propped against the window and the .22 caliber rifle was not in his house at all. If true, this testimony would necessarily lead to the conclusion that these weapons were not in the plain view of the officers who entered his house and who testified that they removed the weapons therefrom. Johnson testified that he did not know whether the pistol was in the boot where the officer testified that he found it and he did not testify with reference to the location of the machine gun. This testimony came too late in the trial to require the trial judge to conduct a voir dire and make a finding of fact as to whether the rifle and shotgun were in the plain view of the officers as they walked into the Johnson house.

The testimony of the police officers concerning the entry into the Johnson house is not otherwise in dispute. The officers were, as the court found with reference to the articles removed from the shed, in possession of warrants for the arrest of Bowles and Stevens. Before entering the Johnson house they had taken Gunter and the two Johnsons into custody. Ronald Johnson thus knew that they were officers and the purpose of their being in the vicinity. Nothing in the record indicates that the officers used any force in gaining entrance to the Johnson house from which Ronald Johnson, himself, had just emerged.

G.S. 15A-401(e) had no application to the present case, which arose prior to the effective date of that statute. G.S. 15-44, now repealed by G.S. Ch. 15A, applies to the present case. It, however, relates to the right of an officer to "break open the door," enter the house and make the arrest. There is nothing to indicate that any such breaking by the officers occurred in this instance.

Upon this record, the officers were lawfully in the Ronald Johnson house, having reason to believe that Bowles and Stevens might be therein. Under the circumstances, the seizure by the officers of these weapons in a house wherein men charged with first degree burglary and armed robbery might well have been hiding cannot be deemed unreasonable. The admission of the weapons in evidence and the overruling of the defendants' objection to the testimony of the State's ballistics expert witness concerning them cannot be deemed error.

[4] There is no merit in the defendants' contention that the court erred in permitting Francis, over objection, to describe the appearance of and clothing worn by his assailants and in admitting in evidence a shirt and jacket worn by Curry when he was arrested.

Francis testified that, at the time his house was broken into and he was beaten by the eight assailants, Stevens was wearing a cut off blue jean jacket on the back of which was the word "Outlaw"; Curry was wearing a black T-shirt and blue jeans, the shirt bearing the word "Outlaw" on the back and the words "One Percenter" on a patch on the front; and the other assailants wore blue jeans and T-shirts, all having long hair and beards. He then testified that he had been shown approximately 20 photographs at the police station and from these he picked Gunter, Bowles, Ronald Johnson and Stevens as members of the group which attacked him. Nothing in the record indicates that photographs of Curry and Albert Johnson were among those shown to Francis.

The officer handling the photographic identification procedure testified that he, after talking with Francis about the incident, obtained from the Charlotte Police Department photographs of members of the "Outlaw Motorcycle Club" and these were the photographs from which Francis identified Gunter, Bowles and Stevens. Nothing in the record indicates that, at the time of the photographic identification procedure, Francis was told that these were photographs of members of the "Outlaw

Motorcycle Club" or that the photographs themselves so indicated. The shirt and jacket worn by Curry when he was taken into custody and which bore the words "Outlaw" and "One Percenter" were admitted in evidence.

Gunter, the two Johnsons and Stevens contended throughout that they were not present on the Francis premises when the alleged offenses occurred, and Bowles and Curry contended that, while present, they did not attack Francis or enter his house. Thus, one of the principal questions for the jury was the correctness of Francis' in-court identification of the six defendants as members of the attacking group. His testimony as to the clothing and personal appearance of his assailants was clearly relevant and competent evidence. Clothing worn by Curry at the time of his arrest at the scene of and shortly after the alleged offenses was relevant to his identification as one of the attacking group and its admission in evidence was proper. *State v. Dickens,* 278 N.C. 537, 180 S.E. 2d 844; *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345; *State v. Peele,* 274 N.C. 106, 161 S.E. 2d 568; *State v. Tippett,* 270 N.C. 588, 155 S.E. 2d 269. The fact that it bore insignia identifying him as a member of an organization or characterizing him unfavorably does not make the article of clothing inadmissible. See, *State v. Hairston,* 280 N.C. 220, 185 S.E. 2d 633. On cross-examination Ronald Johnson testified that, at the time the officers took him into custody, he also wore a black T-shirt bearing like emblems. We find no error in the admission of this testimony and these exhibits.

[5] There is no merit in the contention of the defendants that it was error to permit the State to cross-examine the defendants who testified in their own behalf with reference to other acts of misconduct. The defendants Gunter, Ronald Johnson, Bowles and Curry testified as witnesses in their own behalf. Consequently, they were subject to cross-examination designed to impeach their credibility. Strong, N. C. Index 2d, Criminal Law, § 86. For this purpose a defendant in a criminal case who takes the witness stand may not be asked on cross-examination as to whether he has been accused, indicted or arrested for an unrelated criminal offense. *State v. Williams,* 279 N.C. 663, 185 S.E. 2d 174. He may, however, be asked whether he has been convicted of or has committed such criminal acts or other specific acts of reprehensible conduct, provided the question is asked in good faith. *State v. Lowery,* 286 N.C. 698, 708, 213 S.E. 2d 255; *State v. Gainey,* 280 N.C. 366, 373, 185 S.E. 2d 874; Stansbury, North Carolina Evidence (Brandis Revision)

§ 111. The record discloses no violation of the rule of *State v. Williams, supra,* and contains no indication of bad faith on the part of the prosecuting attorney in questioning any of the defendants who testified concerning prior convictions and acts of misconduct.

[6] Francis' stepfather, not a police officer, apprehended Curry at the Francis house when the stepfather and Francis returned thereto following the alleged offenses. Francis immediately identified Curry as one of his assailants and the stepfather held Curry at gun point while Francis went to call the police. The stepfather asked Curry who had been with him. Curry first refused to give such information but later said, "I'll take you to the rest of them if you will let me go." The stepfather was permitted to testify as to this statement by Curry, over Curry's objection. All of the defendants now assign this ruling as error. Although Curry was being held at gun point, nothing in the record indicates any threat to use the weapon except for the purpose of detaining him until the officers arrived and nothing indicates that the above statement was coerced. As an admission by Curry it was competent against him. The other defendants did not object to the testimony and it does not in any way implicate any of them. There is no merit in this assignment of error.

[7] For the purpose of establishing his alibi, the defendant Stevens called as his expert witness Lawrence A. Kelly, who testified that, in his opinion, Stevens signed, in the name "Gerald Murphy," the application for a motor vehicle registration in the State of Colorado dated 4 April 1974, the date on which the burglary of the Francis house is alleged to have occurred. The document examined by Kelly, upon which this opinion by him was based, was a photostatic copy of the original application. To rebut the testimony of Kelly the State called Vincent Severs, a handwriting expert, who testified that, in his opinion, the photostatic copy was not adequate basis for the formation of a reliable opinion as to whether Stevens had signed the original application because a photostatic copy does not show clearly certain characteristics of the handwriting. The defendants contend that since Severs testified that he, himself, could not determine whether the signature shown on the photostatic copy and the known sample of Stevens' handwriting were written by the same hand, it was error to permit him to testify as to differences appearing upon the said exhibits in the formation

of certain letters. There is no merit in this contention. Although the witness was unable to form an opinion satisfactory to himself as to whether Stevens had or had not signed the document, he could still point out certain observable differences between the two documents offered him for comparison.

[8] Francis, when asked if he had any other occasion to see Albert Johnson after the attack upon him, replied that he had picked Albert Johnson out of a lineup the next day. The defendants objected and a voir dire was conducted. This disclosed that there were five people in the lineup, all white males in their twenties, all with long hair and beards and all wearing T-shirts and blue jeans. Of the five, Francis picked the two Johnsons, Gunter and Curry. Thus, of the five men in the lineup four were among the defendants now on trial and of these Curry had previously been identified by Francis at the time of his arrest, and Ronald Johnson and Gunter had been previously identified by him from photographs.

At the conclusion of the voir dire, the court found that the lineup was not conducted in a proper manner but that, at the time of the offenses, Francis had ample opportunity to observe his assailants in his home, which was well lighted, and outside the home in an area also well lighted and that his in-court identification of each defendant was of independent origin, based solely on what the witness saw at the time of the alleged crime and was not the result of any out-of-court confrontation or of the examination of any photograph. The court, therefore, concluded that Francis' in-court identification of each defendant was admissible. The court's findings of fact on the voir dire, being fully supported by evidence, are conclusive on this appeal. *State v. Harris, supra; State v. Pike, supra; State v. Gray, supra.* The findings support the court's conclusion. The court further concluded that each of the defendants, including Albert Johnson, had waived his right to object to his identification by Francis through each such defendant's failure to object earlier to Francis' in-court identification of him and to Francis' earlier detailed testimony as to the part played by each such defendant in the alleged offenses. The record clearly supports this conclusion. Accordingly, there was no error in the admission of the in-court identification by Francis of each defendant.

The reference by Francis to his having identified Albert Johnson in the lineup came in response to a question by the prosecuting attorney, which question did not indicate that a

lineup identification would be forthcoming. Hence failure to object prior to the answer would not waive the incompetency of the lineup identification, and had a motion to strike the answer been made, it should have been allowed. However, no motion to strike was made.

This testimony before the jury by Francis concerning the lineup did not relate to any other defendant. The fact that Gunter, Curry and Ronald Johnson were also in the lineup and were picked by Francis was brought out on the voir dire only and not before the jury. Consequently, the failure to strike this reference to the lineup identification of Albert Johnson would, in no event, entitle any other defendant to a new trial.

[9] Subsequently, Police Officer Morris testified on direct examination, without objection, that Francis identified Albert Johnson at a lineup composed of Albert Johnson, Gunter, Curry and an unidentified inmate of the jail. This being, obviously, the same lineup which the court had previously held invalid, this testimony was incompetent, but the failure of the defendants to object thereto waived the matter. On cross-examination the defendants developed that an attorney was present to represent the defendants at this lineup. To their question, "Mr. Selvey (the attorney) objected to that lineup, didn't he?" objection by the State was sustained. The State's objection to the defendants' question to the witness, "Do you consider that a fair lineup?" was also sustained. The record does not show what the witness would have answered to either of these questions. For this reason, if for no other, there is no merit in the assignment of error relating to these rulings of the trial court.

Due to the nature of the offenses with which the defendants are charged and to the sentences imposed, all of which are within the statutory authorizations, we have carefully examined each assignment of error brought forward in the briefs of the defendants. We find in none of them any basis for disturbing the judgments as to any of the defendants.

No error.